Louise BOSTON, Administratrix of the Estate of Mae Evelyn Boston, Deceased, Plaintiff,

v.

LAFAYETTE COUNTY, MISSISSIPPI, et al., Defendants.

No. WC87–151–B–D.

United States District Court, N.D. Mississippi, W.D.

July 30, 1990.

Ellis Turnage, Cleveland, Miss., for plaintiff.

R. Lloyd Arnold, Jackson, Jay Gore, III, Grenada, H. Scot Spragins, Oxford, for defendants.

## MEMORANDUM OPINION

BIGGERS, District Judge.

This case arises out of an unfortunate chain of events which resulted in the death of Mae Evelyn Boston ("Boston") during her detention in the Lafayette County Jail on July 12, 1987, after her sister signed an affidavit that Boston was mentally deranged and needed confinement for the protection of herself and others. The plaintiff, administratrix of the deceased's estate, alleges causes of action against Lafayette County, Mississippi under 42 U.S.C. § 1983 and Mississippi's wrongful death statute. She seeks both damages and declaratory relief.

All parties in this cause have filed motions for summary judgment. Presently before the court are the cross motions of the plaintiff and defendant Lafayette County. Having thoroughly reviewed the pleadings, memoranda and exhibits, the court will now rule on the two motions pursuant to Federal Rule of Civil Procedure 56. Because the court will deny the plaintiff's motion for partial summary judgment in its entirety, the evidence submitted is reviewed in a light most favorable to the plaintiff.

## I. FACTS

Prior to her detainment in the Lafayette County Jail, Boston suffered from both psychological and physical medical problems. A diagnosed paranoid schizophrenic, she underwent therapy and received psychotropic medication for chronic schizophrenia a number of years prior to her death. She also suffered from obesity. In late 1986, she became pregnant and developed gestational diabetes, which her physician controlled through insulin. She was also taken off psychotropic medication for the course of her pregnancy. Boston's pregnancy continued without further complication and she gave birth to a child by caesarian section at the Oxford–Lafayette Medical Center on June 28, 1987. She was hospitalized for five days following her surgery. On July 8, ten days after giving birth, Boston reported to the Oxford–Lafayette Medical Center Emergency Room and complained of abdominal pain. The examining physician diagnosed her condition as endometritis, an infection inside the uterus, prescribed a two day supply of antibiotics, and instructed Boston to return to the center the following day.

That same day, Boston's psychological condition began to deteriorate. Her sister called the Region II Mental Health Center and informed officials that Boston was agitated, unable to sleep and possibly hallucinating. An appointment was scheduled for the thirteenth, and psychotropic medication was prescribed to sustain her until her appointment.

On July 9, Boston returned to the medical center as requested by her doctor. However, the doctor was unavailable, so only her blood pressure and temperature were taken. These readings appeared normal.

Despite prescribed psychotropic medication, Boston suffered a severe relapse of her paranoid schizophrenia on the night of July 9. Late that evening she became very boisterous and argumentative, and remained upset throughout the night. Early the next morning she stepped out of her room and requested insulin, telling one of her sisters that she was having a "sugar attack." Her sister complied with the request and filled a syringe with approximately 30cc of insulin. Boston then injected the insulin and repeatedly stabbed herself with the empty syringe until it was taken away. Shortly thereafter, Boston emerged from her room and announced to

the family that her baby had fallen out of bed and died. The infant was discovered alive and unharmed, but Boston then attempted to choke the baby, claiming she was "fixing to have a baby."

Due to Boston's highly aberrant behavior, her family sought her commitment to a mental health facility pending a psychiatric and physical evaluation. One of Boston's sisters went to the chancery clerk's office, where she filled out an affidavit and application for commitment. As grounds for the application, the sister wrote: "Evelyn takes all of her clothes off, taking shots of insulin for sugar, choking a ten day old baby."

Bill Plunk, the Chancery Clerk, relayed the information on the affidavit by telephone to Mel Davis, whom the Chancery Judge had previously appointed as Special Master over the proceedings. Neither county official asked about nor was told that Boston had recently given birth and suffered from diabetes.[1]

Special Master Davis instructed Plunk to issue a writ to take custody of Boston, based upon the information Plunk supplied. The writ commanded the Lafayette County Sheriff to place Boston in the Lafayette County Jail until further orders of the court. During the same proceeding, Davis appointed an attorney to represent Boston in the event a future commitment hearing was deemed necessary, and issued an order for a psychological and physical examination to be performed on Boston within twenty-four hours.

Two city police officers, Pettis and Webb, complied with the custody order and transported Boston to the jail at approximately 9:40 that morning. When she arrived at the jail she was making grunting sounds and pushing down on her abdomen.[2] As she was being accompanied into the jail, she appeared physically ill to one of the officers; "real quiet, ... like she might've been at ... the time ... in some kind of pain or something. [T]he way you can tell just by looking at somebody ... [that] they might be sick."[3] However, Ricky Miller, the jailor who received Boston into custody, also observed her at this time and stated that she "just had a wild-eyed look about her, [a] sort of dazed look."

Miller and the officers took Boston inside the jail and placed her alone inside a six-man cell. Although written policy required that Miller fill out a medical sheet by conducting a visual inspection of the detainee and asking various specific questions regarding the detainee's physical condition and health history, Miller did not fill out any part of the form or ask any questions of Boston. Similarly, he did not attempt to contact Boston's family or physician in order to answer the questions on the screening form or otherwise assess Boston's physical condition. Therefore, Miller and the other jailors, the sheriff, and officials within the chancery clerk's office remained unaware of Boston's medical history and recent caesarian section; however, before leaving the jail, Officer Webb told Miller that Boston had recently taken two injections of insulin, he did not know how much, and that she needed to be watched. Miller acknowledged hearing this information.

During the course of the weekend, Boston repeatedly demanded her medicine, which each jailor on duty administered according to directions.[4] She often requested her medicine in a loud and agitated manner, even when it was not yet due, but never affirmatively stated that she was in pain, or that she wanted the medicine to alleviate pain. No trained medical personnel examined Boston between the time of

---

1. The testimony on this issue is somewhat conflicting. Officer Webb testified that Georgia Boston, the sister who signed the affidavit, informed Plunk of the deceased's recent caesarian section. However, Georgia Boston testified that Plunk never asked her any questions.

2. The city police officers believed that Boston was hallucinating about having a baby when she performed this act. Neither party has presented evidence as to the whether these actions were actually caused by hallucinations or physical pain.

3. Deposition testimony of Officer Elzie Morgan, Jr.

4. Boston refused medication from Miller on one or more occasions, but accepted medication from the other jailors.

her detainment and the time of her death, and no one from her family informed the jailors or any county officials about her recent caesarian section.

The jailors, none of whom had medical training or instruction in first-aid, examined Boston approximately every half hour throughout her detention to determine how she was performing both physically and mentally. She slept and sat on her cot throughout the weekend, often not responding to jailors' inquiries.

On Sunday morning, July 12, 1987, Miller checked on Boston at 11:15 a.m. At that time she appeared to be asleep and snoring. Boston apparently died, unnoticed by Miller, between this check at 11:15 a.m. and his next visit approximately thirty minutes later. When Miller next observed her he noticed she was quiet and, curiosity aroused, attempted to wake her. When he was unable to awaken Boston, he summoned an ambulance and called the Sheriff and informed him that he was having trouble "waking" Boston. She was pronounced dead on arrival at the Oxford–Lafayette County Emergency Room.

The autopsy report reveals that Boston died from heart failure caused by blood clots. The pathologist who conducted the autopsy, Dr. Brooks Allison, examined both the legs and the pelvic area in an effort to discover the source of the clots, but could not do so. He maintains the clots formed within several minutes to hours, certainly within twenty-four hours, prior to her death. Dr. Allison and several other doctors also assert that Boston received reasonable medical care during her detainment in the Lafayette County Jail.

In contrast, Dr. Rodrigo Galvez, a pathologist and psychiatrist, who did not personally examine the deceased, contends the clots took "more than twenty-four hours to form and in all probability ... [were] formed for several days[] prior to her death." He bases this opinion on the small size and large number of clots noted in the autopsy report. Additionally, he states that clots of this size usually originate in the pelvic area. Dr. Galvez and a physician, Dr. Pieroni, are of the opinion that Boston did not receive reasonable medical care during her detainment.

The sheriff and jailors at the Lafayette County Jail routinely detain mentally ill persons pursuant to writs to take custody issued by the state chancery court. Between 1984 and 1988, well over one hundred persons were detained in the Lafayette County jail while awaiting involuntary commitment hearings. Each detainee remained in the jail on the average of three to ten days.[5]

Pursuant to written policy, the jail routinely relies on a medical screening form to determine the physical condition of each mentally ill detainee. The form is composed of two parts: a section which the jailor completes based on his visual assessment of the detainee's condition upon arrival, and an "Officer–Inmate Questionnaire," which the jailor fills out after asking specific questions concerning the detainee's medical history. The questionnaire portion of the screening form requires accurate responsive information to be of any informative value.[6] It is undisputed that county jailors receive no medical training and are not instructed how to evaluate any questions on the screening form. Sheriff East trains each jailor and instructs them as to their administrative duties when they commence work.[7] East and Miller acknowledge that the form requires asking detainees whether they have recently given birth.

It is uncontroverted that the county has no policy of contacting a detainee's family or physician to determine the detainee's medical condition or medical history, and that no attempt is made to obtain any medi-

---

**5.** Deposition testimony of jailor Ricky Miller, based upon the fifty or more mental detainees whom he has personally handled.

**6.** The officer's visual inspection covers general subjects such as whether the detainee is conscious, visibly ill, or apparently under the influence of barbiturates. The questionnaire section asks more specific questions, such as whether the patient is diabetic, has recently been hospitalized or seen a psychiatric doctor, or has recently delivered.

**7.** Deposition testimony of Sheriff Buddy East.

cal records. The jail does not receive a copy of the affidavit on which a writ to take custody is based, though this affidavit sets forth the aberrant behavior for which each detainee is temporarily committed.

The jail does, however, attempt to provide appropriate medical care to mentally ill detainees. Written policy requires that mentally ill detainees be housed separately from other inmates. Detainees' mental and physical conditions are routinely examined, at county expense, by two court-appointed physicians within twenty-four hours of issuance of the writ to take custody, and detainees are visually checked every thirty minutes by the jailor on duty. If a person has prescribed medication, the jailors administer it as directed by the prescription.[8] Mentally ill detainees, as with other inmates, are also provided medical care if they request it.[9] If an incarcerated person complains of illness during office hours, he is examined by one of two local physicians on a space-available basis. All sick or injured persons are transported to the Oxford–Lafayette Medical Center Emergency Room for treatment in emergency situations.

The plaintiff seeks summary judgment as to liability, asserting that the decedent suffered a deprivation of her constitutional rights to substantive and procedural due process when she was detained in the Lafayette County Jail pursuant to a County policy or custom. Additionally, the plaintiff alleges that as a matter of law, Lafayette County violated the decedent's right to substantive due process by customarily failing to provide adequate medical care to temporarily detained persons awaiting involuntary commitment hearings, and by remaining deliberately indifferent to an obvious need to medically train jail personnel.

The county claims that summary judgment in its favor is appropriate on all of the plaintiff's constitutional claims; it argues that Boston's constitutional rights were not violated when she was placed in the jail and

that she received adequate medical care during her detainment. Even assuming that Boston's right to due process was violated by placing her in the jail, the county contends that she was placed in the jail pursuant to state, not county policy. Should its motion for summary judgment be granted in its entirety, the county requests dismissal of the plaintiff's pendent claim pursuant to the doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## II. LAW

To withstand a motion for summary judgment, a party must demonstrate that a genuine issue of material fact exists as to every element of the cause on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To impose liability upon the county pursuant to § 1983, the plaintiff must prove: (1) a policy (2) of the county's policymaker (3) that caused (4) the deceased to be subjected to a deprivation of a constitutional right. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Palmer v. City of San Antonio*, 810 F.2d 514 (5th Cir.1987).

### A. Placement of Boston Within the Jail

The plaintiff apparently submits two different theories to advance her claim that the county deprived Boston of substantive due process by placing her in the jail. First, the plaintiff contends the Due Process Clause flatly prohibits detainment of persons in county jails pending civil commitment proceedings. Second, the plaintiff asserts that all persons detained pending involuntary commitment proceedings are constitutionally entitled to detainment in the least restrictive alternative environment. The defendant argues that neither theory articulates a right recognized under the Fourteenth Amendment, and that even if Boston suffered a constitutional depriva-

---

**8.** The questionnaire inquires as to prescribed medication. Although Boston was not asked any of the questions on the form, the county promptly retrieved and administered her medication after she began calling for it.

**9.** Deposition of Sheriff East.

tion by being placed in the jail, the decision to detain her pending a psychiatric evaluation cannot be considered county policy for purposes of § 1983.

### 1. *Per Se Unconstitutionality of Jail Detention*

■ Mississippi Code Annotated § 41–21–67(4) (Supp.1989) authorizes a chancellor or duly appointed special master to order the temporary detention of an individual in jail if he finds probable cause to believe the person is mentally ill and that jail is the only reasonable location for detention.[10] By challenging the chancellor's statutory prerogative to temporarily detain mentally ill persons in jail, the plaintiff launches a facial attack on the constitutionality of the statute. *See Bigford v. Taylor*, 834 F.2d 1213, 1222 (5th Cir.1988).

To determine substantive rights under the Due Process Clause, courts are instructed to weigh "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Youngberg v. Romeo*, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982). At a minimum, due process requires some rational relationship between the nature and duration of commitment and its purpose. *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).

Government-imposed detainment pending an admission hearing, like involuntary commitment itself, is a "massive curtailment of individual liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). On the other hand, the government has a "compelling interest in the emergency detention of those who threaten 'immediate and serious violence to themselves or others,'" and must be permitted to detain such persons, provided the nature and duration of detention comports with constitutional parameters. *Lynch v.*

*Baxley*, 744 F.2d 1452, 1458 (11th Cir.1984) (quoting *Lynch v. Baxley*, 386 F.Supp. 378, 387 (M.D.Ala.1974)).

■ The plaintiff's memorandum implicitly concedes the government is empowered to temporarily detain, pending professional evaluation, those who appear violent and mentally ill, yet it does not present any authority explaining how individual liberty interests dictate the conclusion that use of jails for temporary detention is flatly unconstitutional. Names or labels carry no inherent weight in due process analysis, and the mere labelling of a detainment facility as a "jail" instead of a "mental health facility" does not, without something more, shift the balance of interests in the direction of finding a constitutional violation. Indeed, the use of artificial labels to sidestep weighing conflicting interests directly conflicts with Supreme Court precedent analyzing the Due Process Clause. *E.g., Youngberg*, 457 U.S. at 320–21, 102 S.Ct. at 2460–61. *Accord Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979); *Parham v. R.*, 442 U.S. 584, 599–600, 99 S.Ct. 2493, 2502–03, 61 L.Ed.2d 101 (1979)). *Cf., Stern v. Tarrant County Hosp. Dist.*, 778 F.2d 1052, 1056 (5th Cir.1985), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986) (rejecting per se analysis of equal protection clause). In *Youngberg*, the Supreme Court did not mince words and rely on formalistic definitions when it reversed the lower courts' rulings and permitted restrictive conditions of confinement imposed upon pretrial detainees: "[w]hether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility." *Bell*, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979).

**10.** Specifically, the section states:

If the chancellor determines that there is probable cause to believe that the respondent is mentally ill and that there is no reasonable alternative to detention, the chancellor may order that the respondent be retained as an emergency patient at any available regional mental health facility or any other available suitable location as the court may so designate pending an admission hearing and may, if necessary, order a peace officer or other person to transport the respondent to such mental health facility or suitable location. Provided, however, ... the respondent shall not be held in jail unless the court finds that there is no reasonable alternative.

The court is cognizant of no reason why a county may not, in the interest of societal safety, temporarily detain in jail an individual who, despite prescribed psychotropic medication, has exhibited violent tendencies towards herself and her own infant. If substantive due process is deprived, be it jail or mental health facility, the deprivation is caused by a failure to provide constitutionally adequate food, clothing, shelter, medical care and other safe conditions of confinement—not by any official title placed over the front entrance. Consequently, the court declines to hold that use of jails for temporary detention of persons awaiting civil commitment proceedings is unconstitutional per se.

The plaintiff cites *Lynch v. Baxley*, 744 F.2d at 1461 as supporting her proposed bright-line rule. However, a fair reading of *Lynch* does not support the plaintiff's interpretation. In holding that the use of Alabama county jails to detain persons awaiting civil commitment proceedings violated substantive due process, the *Lynch* court emphasized that Alabama County jail conditions almost uniformly violated the Eighth Amendment prohibition of cruel and unusual punishment, and implied that statewide constitutional inadequacies did not appear rectifiable in the near future. *Id.* at 1461. It consequently held that "[t]emporary jail detention ... *as ... currently practiced in Alabama* violate[d] substantive due process." *Id.*

2. *The Least Restrictive Alternative*

Alternatively, the plaintiff contends that Boston's substantive due process rights were deprived by the county because she was placed in the county jail when a less restrictive alternative, the Oxford–Lafayette Medical Center, presented a viable option. Assuming that Boston could indeed have been properly detained in the Oxford–Lafayette Medical Center, the court is of the opinion that Boston was not constitutionally entitled to placement in the least restrictive alternative environment.

The Fifth Circuit has previously ruled against mentally retarded plaintiffs seeking the right to habilitation in the least restrictive alternative setting.[11] *Lelz v. Kavanagh*, 807 F.2d 1243, 1251 (5th Cir.), *reh'g denied*, 815 F.2d 1034, *cert. dismissed*, 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987); *Feagley v. Waddill*, 868 F.2d 1437, 1440 (5th Cir.1989). *See also Youngberg*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28. *Contra, Lynch*, 744 F.2d at 1459. At most, the least restrictive alternative setting is a factor to be considered in determining the scope of constitutional protection afforded each individual. "[T]he imperative that least drastic means be considered does not imply a constitutional right on the part of every individual to a personal judicial determination that the means being employed to improve his condition are the best possible or the least restrictive conceivable." *Gary W. v. State of La.*, 437 F.Supp. 1209, 1217 (E.D. La.1976). Requiring optimum conditions of confinement "misperceives the real issue," which is "whether the existing level of habilitation represents a gross and unwarranted departure from the minimum standard necessary...." *Lelz*, 807 F.2d at 1251.

While Boston was temporarily detained because of mental illness, not permanently housed due to mental retardation, the rationale denying an entitlement to the least restrictive alternative setting, as articulated in *Lelz*, applies to Boston's detainment pending a possible admission hearing for civil commitment. Hence, the plaintiff cannot impose liability upon the county simply because Special Master Davis ordered Boston temporarily placed in the Lafayette County Jail instead of a less restrictive alternative setting.[12]

11. Other circuit and district courts are in accord with this holding. *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir.1984); *Rennie v. Klein*, 720 F.2d 266 (3d Cir.1983); *Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir.1983); *Association for Retarded Citizens v. Olson*, 561 F.Supp. 473, 486 (D.N.D. 1982), *aff'd on other grounds*, 713 F.2d 1384 (8th Cir.1983); *Garrity v. Gallen*, 522 F.Supp. 171, 237–39 (D.N.H.1981).

12. Citing *Donaldson v. O'Connor*, 493 F.2d 507 (5th Cir.1974) and *Gary*, 437 F.Supp. 1209, the plaintiff claims the county is liable for Boston's demise because it placed her in a facility in which she did not receive psychiatric care.

The plaintiff's theories of recovery, as presented, do not create a genuine issue of material fact regarding whether the decision to place Boston in the Lafayette County Jail violated her right to substantive due process.[13] However, even if the court were to find that detainment in jail necessarily deprived Boston of substantive due process, it would still be required to hold that the decision to detain her in jail is not fairly attributable to the county under § 1983.

### 3. The Judicial Function Doctrine and Lafayette County Policy

■ To impose § 1983 liability upon Lafayette County for the actions of Special Master Davis and Chancery Clerk Plunk, the plaintiff must demonstrate that the two officials were county policymakers when they ordered and executed the detainment of Boston in the Lafayette County Jail. *Monell*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also, Bigford v. Taylor*, 834 F.2d 1213, 1221–23 (5th Cir. 1988). Whether or not an official is a policymaker for purposes of § 1983 liability is a question of state law. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986). A county judge can be considered a policymaker under § 1983, provided he is the "final authority or repository of county power." *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir.1980) (emphasis supplied). Presumably, this rule also applies to a special master, who, pursuant to state law, is temporarily empowered to function as a judge with respect to particular duties.

■ The Fifth Circuit, however, has uniformly rejected attempts to hold local governments liable for constitutional deprivations caused by local judges' interpretation and implementation of state law. When performing a judicial function by interpreting a state statute—which limits

his discretion and is not merely a standardless grant of authority—a judge acts to *implement* state policy rather than *create* policy for the local government of which he is a part. *Familias Unidas*, 619 F.2d at 404; *Carbalan v. Vaughn*, 760 F.2d 662, 665 (5th Cir.), cert. denied, 474 U.S. 1007, 106 S.Ct. 529, 88 L.Ed.2d 461 (1985); *Bigford*, 834 F.2d at 1221–23. In *Familias Unidas*, the court first applied the judicial function doctrine and explained when a Texas county judge could be considered a policymaking official:

> In *addition* to his judicial duties, a Texas county judge is charged by the state constitution and statutes with the performance of numerous executive, legislative and administrative chores in the day-to-day governance of the county.
>
> . . .
>
> The narrow authority delegated to the county judge in [this statute], however, bears no relation to his traditional role in the administration of county government or to the discretionary powers delegated to him by state statute in aid of that role. Instead, his duty in implementing [this statute], much like that of a county sheriff in enforcing state law, may more fairly be characterized as the effectuation of the policy of the [state] embodied in that statute, for which the citizens of a particular county should not bear singular responsibility.

619 F.2d at 404 (emphasis supplied).

■ The judicial function doctrine controls whenever a judge performs his judicial duties and his discretion is sufficiently narrowed by state statute, whether he properly applies a facially unconstitutional statute or improperly applies a constitutionally valid statute. *Familias Unidas*, 619 F.2d at 402 (proper application of facially unconstitutional statute); *Carbalan*, 760

---

However, *Donaldson* and *Gary* addressed the needs long term committed patients, not temporary detainees. Additionally, any failure to provide psychiatric care to Boston during her detainment cannot be considered the cause of her subsequent death from heart failure. *Polk Co. v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (policy must be moving force of the constitutional deprivation).

**13.** The defendant cites *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979), as delineating the proper due process standard to apply to mentally ill detainees. However, the plaintiff does not cite the *Bell* opinion in arguing that Boston was deprived of her right to liberty, so the court need not determine whether the *Bell* standard is applicable.

F.2d at 663–65 (court assumes that municipal judge improperly applied constitutional state law); *Bigford*, 834 F.2d at 1222–23 (court assumes that justice of the peace both improperly applied valid state law and properly applied facially unconstitutional statute). *Cf. Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989) (en banc; municipal judge *was* city policymaking official with respect to *administrative* decisions concerning his personal *office staff*, such as hiring and firing). Though the cases are somewhat unclear on this issue, the doctrine may even shield local governments from liability when a judge's departure from a state statute is intentional. *Compare Bigford*, 834 F.2d at 1222 (judge's deliberate or mistaken departure from controlling law does not represent county policy), *with Crane v. State of Texas*, 759 F.2d 412, 430 n. 19 (5th Cir.) *cert. denied*, 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985) (local governments not immunized from official actions which are both unconstitutional and illegal under state law).

The proposed justifications for the judicial function doctrine have varied slightly with the facts of each case. However, the Fifth Circuit consistently has set forth two, somewhat interdependent rationales. First, when applying a state statute, a local judge must fairly be construed as implementing state policy because he is attempting to effectuate the goals of the state legislature. Second, because a judge does not choose the goals and policies of the particular statute he applies, his discretion is narrowed sufficiently so that the state, not the local government, is improperly using its power to deprive a constitutional right.

■ The judicial function doctrine controls in the present case. Appointed by the State Chancery Judge, Special Master Davis performed a judicial duty pursuant to state statutory authority when he ordered Boston's temporary detainment in the Lafayette County Jail. It is irrelevant whether the jail or hospital was the most appropriate place of confinement for purposes of this question, for the Special Master was interpreting a state statute which substantially limited his discretion, and he cannot be considered a county policymaker for purposes of § 1983. Likewise, neither can Chancery Clerk Plunk, who issued the writ pursuant to Davis' directive.

The plaintiff claims that *Crane v. State of Texas*, 759 F.2d 412, controls whether the actions of the Special Master and Chancery Clerk can be considered county policy. However, the plaintiff ignores a crucial distinction between the facts of *Crane* and the case at bar. In *Crane*, a county prosecutor implemented a system by which the county would issue a capias for a misdemeanor arrest without any prior determination of probable cause by a neutral and detached magistrate. *Id.* at 414–15. The statutes in question granted the prosecutor " 'the authority to define objectives and choose the means of achieving them,' not merely the latitude to exercise discretion in pursuing objectives and employing means set by other agents...." *Bigford*, 834 F.2d at 1221 (quoting *Rhode v. Denson*, 776 F.2d 107, 109 (5th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986)). Indeed, the statutes "were so drawn as to *require* the exercise of discretion." *Crane*, 759 F.2d at 430 n. 19 (emphasis original).

Unlike the statutes in *Crane*, Mississippi Code Section 41–21–67(4) leaves little room for the exercise of discretion. Davis was permitted to commit Boston to the Lafayette County Jail only if he determined there was no reasonable alternative. Even if Davis negligently misapplied or misinterpreted the statute, his decision, and Plunk's subsequent conformance with his directive, cannot be considered county policy for purposes of § 1983 damage liability.

### B. Procedural Due Process

■ The second amended complaint alleges that the county violated Boston's right to procedural due process by failing to comply with three state statutes during her detainment. Miss.Code Ann. §§ 19–25–35, 19–25–69 (1972), 41–21–69 (Supp.1989). Upon review of the statutes and the plaintiff's argument, the court is of the opinion

that the county is entitled to summary judgment on the plaintiff's procedural due process claim.

Mississippi Code Sections 19–25–35 and 19–25–69 place a statutory duty upon the sheriff to keep safely prisoners entrusted to his care.[14] The plaintiff asserts these statutes granted Boston an entitlement to safekeeping during the period of her detainment, and that she was deprived of her statutory right without due process of law.

It is readily apparent to the court that sections 19–25–35 and 19–25–69 do not avail the plaintiff of a constitutionally cognizable procedural due process claim. The plaintiff couches her argument in terms of the procedural due process clause, but the essence of her allegation is that Boston lost her life due to the county's failure to provide adequate medical care, not that the sheriff deprived Boston of adequate procedural safeguards.

Section 41–21–69(2) of the Mississippi Code entitles each individual detained due to mental illness to a physical and psychological examination by two court-appointed physicians within twenty-four hours of the issuance of the writ to take custody.[15]

Citing *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the plaintiff apparently claims that Boston was denied procedural due process because she was not medically examined within twenty-four hours as required by state statute.[16] Again the plaintiff appears to confuse procedural and substantive due process issues, for nowhere in her second amended complaint or subsequent memoranda does she allege that specific procedural safeguards were overlooked in denying her a statutorily required medical examination. The gist of the plaintiff's theory remains that state law granted the plaintiff a substantive right to a medical examination within twenty-four hours, and that her *substantive* constitutional right to adequate medical care was denied because she did not receive a medical examination in accordance with state law. However, state law does not determine the scope of the Due Process Clause. *Burch v. Apalachee Comm. Mental Health Servs. Inc.*, 840 F.2d 797 n. 8 (11th Cir.1988), *aff'd*, —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). *Cf., Stern v. Tarrant County Hosp. Dist.*, 778 F.2d 1052, 1059 (5th Cir.1985) (en banc), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986) (state law definition of rational classification is not determinative of rational basis analysis under the equal protection clause).

Regardless, the facts do not support a finding of liability, for Special Master Davis *did* order that a complete medical examination be performed within twenty-four hours. Although the Deputy Chancery Clerk and the secretary at the mental health facility set an appointment time

---

**14.** Miss.Code Ann. § 19–25–35 states, in pertinent part:

[The sheriff] shall take into his custody, and safely keep, in the jail of his county, all persons committed by order ... of courts.

Likewise, Miss.Code Ann. § 19–25–69 states: The sheriff shall have charge of the courthouse and jail of his county, of the premises belonging thereto, and of the prisoners in said jail. He shall preserve the said premises and prisoners from mob violence, from any injuries or attacks by mobs or otherwise, and from trespasses and intruders.

**15.** Section 41–21–69(2) provides:

Such *examination shall be conducted and concluded within twenty-four* (24) *hours* after the order for examination and appointment of attorney, and the certificate of the physicians and any psychologist shall be filed with the clerk of the court within said time, unless the running of said period extends into nonbusi-

ness hours, in which event the *certificate* shall be filed at the commencement of the next business day (emphasis supplied).

The county contends that persons who are detained on a Friday, like Boston, are unentitled under the statute to an examination until the following business day. However, the statute clearly indicates that examinations must be performed within twenty-four hours of commitment, regardless of the day on which a person is committed, and that only the corresponding *paperwork* is postponable until the following business day.

**16.** *Roth* did not even remotely concern involuntary commitment proceedings and procedural protections afforded for the mentally ill. In *Roth*, the Court held only that a teacher did not hold a property interest in his employment and therefore was unentitled to notice and a hearing before being terminated from his position. *See* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548.

which violated this order, they are not policymaking officials of the county, and any negligence on their part cannot be the basis of § 1983 liability. *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir.1984), *cert. denied* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985) (definition of policymaking official); *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (allegation of negligence insufficient to maintain § 1983 cause of action).

### C. Failure to Train

■ The second amended complaint also avers that the county denied Boston of her right to appropriate medical care as the result of a county policy or practice of providing inadequate medical training to its jailors. Liability under § 1983 may be premised upon inadequate training if a county "exhibits deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, ——, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412, 426 (1989). *See also Burns v. City of Galveston,* 905 F.2d 100 (5th Cir.1990); *Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). However, there is no constitutional requirement that counties provide their jailors and law enforcement personnel with sophisticated medical training so that they will detect hidden medical problems. The Fifth Circuit recently applied this principle to the detection of suicidal tendencies in pretrial detainees:

> It is one thing to require a [county] to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious mental disorders. It is quite another to require as a constitutional minimum that a [county] train its officers to medically screen each pretrial detainee so that the officers will unerringly detect suicidal tendencies. The latter requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the aver-

age police officer by the due process clause.

*Burns,* 905 F.2d at 104.

Accordingly, the county was not required to train its jailors how to recognize the subtle signs of venous thrombosis and impending pulmonary embolism. While a medical doctor might have recognized Boston's predisposition towards this condition, the county and its jailors were not constitutionally required to provide such a high standard of care.

### D. Medical Care for Mentally Ill Detainees

The plaintiff finally alleges that the county consistently failed to provide constitutionally adequate medical care for mentally ill detainees, and that Boston was deprived of her right to life pursuant to this policy. In response, the county contends it consistently provides adequate medical care, and that Boston received reasonable medical attention prior to her death. The county additionally argues there is no causal connection between any county medical policy regarding mentally ill detainees and Boston's untimely death.

■ The Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment prohibition of cruel and unusual punishment, governs the extent of medical care constitutionally required for pretrial detainees. *Cupit v. Jones,* 835 F.2d 82, 84 (5th Cir.1987). "[T]he due process clause ... accords pretrial detainees rights not enjoyed by convicted inmates under the eighth amendment...." *Id.* Pretrial detainees are entitled to reasonable medical care, unless the failure to provide reasonable care is reasonably related to a legitimate governmental objective. *Id.* at 85; *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1186–87 (5th Cir.1986). "A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills." *Partridge,* 791 F.2d at 1187.

The Fifth Circuit has never directly addressed whether the *Cupit* standard also applies to persons temporarily detained while awaiting civil commitment proceedings. Like pretrial detainees, persons de-

tained due to mental illness are shielded by the Due Process Clause because they are confined though not convicted of a crime. It therefore stands to reason that persons temporarily detained pending civil commitment proceedings are entitled to the same reasonable medical care provided pretrial detainees.[17]

Due to the disorientation and communicative disabilities often suffered by the mentally ill, medical care which is reasonable for psychologically sound individuals might not reasonably suffice for those who suffer from mental illness. Unlike pretrial detainees, mentally ill detainees who are psychotic—as Boston was when detained—"are unable to appreciate, understand or recognize a serious medical condition and are most times too mentally unstable to request medical or psychiatric treatment."[18] Of equal concern, psychosis or derangement can result from a serious underlying *physical* condition, such as disease, alcohol, or other drugs, and an individual suffering from a disease or drug-induced psychosis may require immediate medical attention to remedy the underlying physical ailment. Therefore, not only are psychotic detainees often unable to recognize serious medical conditions or request medical treatment, they may well be psychotic due to a serious ongoing physical illness.

▉ Taking the evidence in a light most favorable to the plaintiff, the court finds that medical care customarily provided by the county for mentally ill detainees does not fall below constitutional standards. The plaintiff concedes she knows of no other mentally ill detainees who have been denied appropriate physical medical care.[19] The county acknowledges the special medical needs of the mentally ill and routinely conducts, at its own expense, physical and mental examinations of mentally ill detainees within twenty-four hours of receiving the writ to take custody. Detainees are given medication as prescribed, and jailors arrange for professional medical care if detainees request it or a serious medical condition is observed. Additionally, jailors visually check on detainees each half hour. While Boston was not examined within twenty-four hours because of a scheduling error, this isolated instance of delay does not on its own permit an inference of an unconstitutional policy or practice under § 1983. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

Indeed, testimony of the plaintiff's own expert, Dr. Galvez, establishes that Boston would have survived had the county followed its usual procedure and examined Boston within twenty-four hours of her detention. Dr. Galvez testifies to a "medical certainty that the thromboemboli which caused Ms. Boston's death [took] more than twenty-four (24) hours to form and *in all probability* [were] formed for several days[ ] prior to her death." He also maintains that Boston would have survived if she had been evaluated because those with medical training would have recognized that "Ms. Boston was a perfect setup for developing complications such as venous thrombosis and pulmonary thromboembolism," and "[p]roper preventive and, as necessary, therapeutic measures would have

---

**17.** The plaintiff seeks to apply the eighth amendment standard set forth in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In *Estelle,* the court held that "[i]n order to state a cognizable claim [under the Eighth Amendment], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292. Noting the eighth amendment standard, the Fifth Circuit has held that pretrial detainees are entitled to at least the same degree of care provided convicted prisoners. *Partridge,* 791 F.2d at 1186; *Burns,* 905 F.2d 100 (5th Cir.1990). Other circuits have directly applied the same standard of medical care granted prisoners under the Eighth Amendment to pretrial detainees under the Fourteenth Amendment.

*Garcia v. Salt Lake County,* 768 F.2d 303, 307 (10th Cir.1985); *Whisenant v. Yuam,* 739 F.2d 160, 163 n. 4 (4th Cir.1984); *Anderson v. City of Atlanta,* 778 F.2d 678, 686 n. 12 (11th Cir.1985). The court's decision would be no different under the *Estelle* standard, for the county knowingly detained over one hundred mentally ill persons over a four year period, and is chargeable with knowledge of the commonly exhibited deficiencies of the mentally ill.

**18.** Affidavit of Dr. Rodrigo M. Galvez.

**19.** Plaintiff's answer to defendant's Interrogatory Number 2.

been undertaken...." [20]  Therefore, if the county employees had followed the usual course of action and had Boston examined within twenty-four hours of detainment, she would have been evaluated by Saturday morning, at the latest.  By that time, according to Dr. Galvez, the clots "in all probability" had formed and were detectable to medically trained personnel.  The county's two physicians, according to Dr. Galvez, would have diagnosed Boston's hidden ailment and administered proper treatment.  Clearly, it was the deviation from standard practice, not county practice itself, that significantly contributed to Boston's death.  Because no county practice of providing medical care was the "moving force" behind Boston's unfortunate death, the county cannot be held liable under § 1983 for a failure to provide adequate medical care.  *Polk Co. v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).

### III.  CONCLUSION

Based on the foregoing, the court finds that no genuine issues of material fact exist, and that Lafayette County's motion for summary judgment is well taken.  The court will dismiss the plaintiff's pendent claim without prejudice pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).  An order in accordance with this memorandum opinion will this day issue.

---

**20.**  Dr. Pieroni also takes the position that a timely professional evaluation of Boston's condition would have prevented Boston's death.