Larry **HOOD**, Administrator of the Estate of David Dwayne Hood, Deceased, Plaintiff,

v.

**ITAWAMBA COUNTY, MISSISSIPPI,** Defendant.

No. EC91–302–D–D.

United States District Court, N.D. Mississippi, E.D.

April 22, 1993.

Barry Walker, Tupelo, MS, for plaintiff.

William Ready, Meridian, MS, for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This is a cause of action pursuant to 42 U.S.C. § 1983 (deprivation of civil rights) in a case set for trial before the undersigned in the near future. The suit is brought by the estate of David Dwayne Hood, a 21 year old man who committed suicide on November 6, 1990, while incarcerated in the Itawamba County jail. Federal question jurisdiction is invoked by the alleged deprivation of the decedent's Eighth and Fourteenth Amendment rights of the United States Constitution. The complaint alleges that Mr. Leland Taylor, former sheriff of Itawamba County and as a policymaker in his official capacity, deprived the decedent of constitutionally protected rights in the following ways: [1]

(1) The failure to adequately train law enforcement officers to recognize the need for and to obtain medical care for arrestees with known suicidal tendencies;

(2) The failure to adopt and implement a policy providing for the safe custodial con-tainment of arrestees known to likely harm themselves or cause harm to others;

(3) The failure to adopt a policy requiring the furnishing of medical care to arrestees with known suicidal tendencies.

In addition to the cause of action based upon § 1983, the estate also asserts a pendent state claim under the Mississippi Wrongful Death Statute, *Miss.Code Ann.* § 11–7–13 (Supp.1992). At this point in time, the period for discovery has passed, and the defendant, Itawamba County (hereinafter "county"), has moved for summary judgment as to all claims. After careful consideration of the record and a review of the relevant case law,[2] the court is of the opinion that the county's motion for summary judgment on the federal claim is well taken, and the same is hereby granted. Since the claims upon which this court has original jurisdiction are being dismissed, the state claims will be dismissed without prejudice so that such claims may be pursued in state court in litigation currently pending. The court reaches this result by application of the case law to the facts of this case. As in all cases, the court begins with the facts which furnish the framework for analysis of the legal issues implicated in this § 1983 lawsuit.

### Facts

By all accounts, David Dwayne Hood led an uneventful life as a child and teenager. David's formative years were spent in Wisconsin, but he moved to Mississippi in 1981 to live with his father's family following the divorce of his parents. From the time that David moved to Mississippi in 1981 and until his death on November 6, 1990, he lived with his paternal grandmother in Fulton, Mississippi. David's father and stepmother also lived nearby in the vicinity of Fulton. The record reveals that in May of 1986, when David was 17 years old, he was involved in a motorcycle accident which resulted in a head

---

**1.** Plaintiff's Complaint, pgs. 5–6, paraphrased.

**2.** *Evans v. City of Marlin, Texas,* 986 F.2d 104 (5th Cir.1993); *Rhyne v. Henderson County,* 973 F.2d 386 (5th Cir.1992); *Bowen v. City of Manchester,* 966 F.2d 13 (1st Cir.1992); *Benavides v. County of Wilson,* 955 F.2d 968 (5th Cir.1992); *Burns v. City of Galveston,* 905 F.2d 100 (5th Cir.1990); *Lewis v. Parish of Terrebonne,* 894

F.2d 142 (5th Cir.1990); *Partridge v. Two Unknown Police Officers of the City of Houston, Texas,* 791 F.2d 1182 (5th Cir.1986); *Boston v. Lafayette County, Mississippi,* 743 F.Supp. 462 (N.D.Miss.1990); *Vega v. Parsley,* 700 F.Supp. 879 (W.D.Tex.1988); *Gagne v. City of Galveston,* 671 F.Supp. 1130 (S.D.Tex.1987).

injury. Several medical notations in the record show that David was diagnosed by physicians as having "brain damage" following the May 1986 motorcycle accident. The motorcycle accident earmarked the beginning of David's problems. From early 1988 until his death in November of 1990, David's conduct and behavior can best be described as incorrigible. In a span of approximately two and a half (2½) years, David was arrested nine (9) times. A summary of David's arrest record appears below.

| | | |
|---|---|---|
| March 1, 1988 | — | Disorderly Conduct |
| August 9, 1988 | — | Causing a Disturbance |
| July 6, 1989 | — | Causing a Disturbance |
| September 6, 1989 | — | Public Drunk |
| February 5, 1990 | — | Simple Assault |
| March 22, 1990 | — | Public Drunk |
| March 25, 1990 | — | Contributing to Delinquency of a Minor |
| June 25, 1990 | — | D.U.I. & Reckless Driving |
| November 6, 1990 | — | Simple Assault |

As the arrest record indicates, David's problems were often associated with alcohol abuse, and the assaults and disturbances usually involved incidents with his grandmother, father and stepmother. In addition to the numerous arrests, there were two other events in David's life which are noteworthy for the purposes of this case. In March of 1988, David's grandmother, Pauline Hood, submitted an affidavit and application for commitment for David to the state hospital for mental health located in Whitfield, Mississippi. In the affidavit/application, notations were entered that David had threatened to kill himself and had assaulted his grandmother. Other remarks in the application for commitment refer to a violent temper and his motorcycle accident in May of 1986. Following the application for commitment, the Itawamba County Chancery Court issued an Order of Commitment to the state hospital on March 10, 1988.[3] Consequently, David was transported and admitted to the state hospital for evaluation, diagnosis, and treatment. In the deposition testimony of Deputy Sheriff Kenneth Knight, Officer Knight stated that he remembered transporting David to the state hospital. However, Officer Knight also stated that he was unaware of the contents of David's commitment papers. Furthermore, Sheriff Leland Taylor also testified that he remembered that David was the subject of a commitment proceeding, but he knew nothing of the details or reasons for the commitment. The commitment papers are contained in a sealed envelope and are delivered to the receiving personnel at the hospital. The law enforcement officers responsible for custody and transport see only the "writ of custody" which does not furnish any details regarding the reasons for commitment.[4]

Approximately one month after the commitment, David was discharged from the state hospital on April 9, 1988. The certificate of discharge stated that David no longer posed a substantial threat of physical harm to himself or others and that he could be treated in a less restrictive environment. The release referred David to his local mental health clinic, and he was continued on two medications.[5] In the blank space on the certificate of discharge under the heading, "Diagnosis of Patient," the following notations were entered, "organic personality syndrome ... closed head injury."

3. The commitment proceedings followed the "usual" course. Following the application for commitment, the chancellor appointed an attorney for David and a physician/psychologist. The court issued a "writ to take custody" to the sheriff of Itawamba County which commanded the sheriff to take custody of David and transport him to the Itawamba County Hospital. Two physicians in Itawamba County examined David on March 7, 1988, and they concluded that he posed a "substantial likelihood of physical harm as manifested by ... recent threat or attempt (sic) physically harm to self or others." David waived a hearing on the commitment proceeding, and Chancellor Ervin issued the Order of Commitment on March 10, 1988.

4. The record in this cause contains a patient profile which was apparently among the sealed documents transported with David to the state hospital. The patient analysis lists numerous problem areas which were circled by David's grandmother. For example, Ms. Hood circled the following areas: sleep, eating and emotional disturbances as well as seizures; suicidal thoughts, anxiety, fears, phobias, depressed mood, inferiority, social withdrawal, isolation, suspicion, anger, belligerence, negativism, alcohol abuse, narcotics, other drugs, anti-social attitudes, agitation, hyperactivity, disorientation, impaired memory, inappropriate behavior/appearance.

5. Haldol and Cogentin.

The second significant event occurred four months later in August of 1988. On August 12, 1988, David's stepmother, Ms. Tami Hood, filed another application/affidavit for commitment on David. In support of the application, Ms. Hood entered the following remarks:

> Respondent threatens to kill self and/or others; goes out all hours of night and roams on other people's property & sits on their porches; chokes grandmother calls her obscene names in front of others, slaps her around. Respondent is violent and is in immediate need of attention.[6]

Again, David's commitment proceeding followed the usual course,[7] and on August 25, 1988, Chancellor James L. Roberts, Jr., entered an Order of Commitment to the Mississippi State Hospital in Whitfield, Mississippi. David's second hospitalization was considerably longer. David was not discharged until May 19, 1989, approximately nine (9) months later. The second discharge also listed David's diagnosis as "organic personality syndrome." As before, David was to receive follow up care at his local community mental health center, and he was continued on one medication.[8] Just as the time before, Sheriff Taylor and Officer Knight testified that they remembered that David was transported to the state hospital, but they were unaware of the reasons or details surrounding the commitment since they only saw the "writ of custody," and not the sealed commitment papers.

As the above history reflects, when David was not a patient at the state hospital at Whitfield, he was back in Fulton getting into trouble with family members and the law. According to the record, law enforcement authorities in Itawamba County had eleven (11) "official" contacts with David. The eleven contacts included nine arrests and two brief occasions when David was undergoing commitment proceedings.[9] However, in addition to his "official" contacts with law enforcement authorities, there were additional contacts with David on a "social" level. Sheriff Taylor and Officer Knight testified that it was common for David to stop in the county jail and visit with the jail staff. Sheriff Taylor and Officer Knight both described David as a very likeable young man with an affable, outgoing personality during his periods of better behavior.[10] David's source of financial support was a social security benefit which he received along with the necessities of life which his grandmother furnished. Occasionally, David would get some spending money from his father. David had been unable to maintain employment for any appreciable length of time.

On the morning of November 6, 1990, David assaulted his grandmother in her home. After the assault, Ms. Hood went to the Justice Court office and filed a criminal affidavit. According to the criminal affidavit which Ms. Hood filed, David pushed her down on the couch and beat her. After filing the affidavit, Justice Court Judge Harold Holcomb issued a warrant for David's arrest on a charge of simple assault. Apparently, the Itawamba County Sheriff's Office received the arrest warrant in the early afternoon of the same day, November 6, 1990. Officer Kenneth Knight testified that he was on patrol in the early afternoon when he

---

6. On the patient profile which David's stepmother completed, she circled the following problem areas: sleep disturbances, seizures and convulsions, suicidal thoughts, suicidal gestures, stop taking medication, management problems, anger, belligerence, negativism, assaultive acts, alcohol abuse, narcotics.

7. A "writ to take custody" was issued, and David was detained in the Itawamba County Jail pending the proceedings. An attorney was appointed for David, and a physician/psychologist was appointed to evaluate David's mental condition. Two physicians examined David and reported to the court that he posed a substantial likelihood of physical harm as manifested by recent threats or attempts to physically harm self or others. The

physicians noted on their report to the court, "patient has threatened both his father and grandmother." David's attorney waived the right to a pre-commitment hearing.

8. Tegretol.

9. For the first commitment proceeding, David stayed at the county hospital pending his transfer to the state hospital, but for the second proceeding, David remained in the county jail pending transfer.

10. In other words, local law enforcement officers in Itawamba County were very familiar with David Hood.

received a call about a disturbance that David Hood caused at his grandmother's house. Consequently, Officer Knight went to Ms. Hood's house, but no one was there. Officer Knight left the house and proceeded on his way, but he soon received another radio call that the sheriff's office had an arrest warrant on David Hood and to take him into custody if found. Then, Knight drove by a house where he observed David Hood in the yard fighting with a girl. When Officer Knight stopped, he learned that David was fighting with his girlfriend at the residence of his girlfriend's grandmother. Officer Knight arrested Hood on the arrest warrant, handcuffed him, and transported him to the jail in the back seat of the patrol car. While in the patrol car enroute to the jail, David talked about how he was going to "whip his girlfriend's ass" since she had left him for another boy. Officer Knight logged David into custody at the jail at 3:49 p.m., placed him in a cell, and returned to his patrol duties. During the transport and booking procedures into jail, David made no mention of suicidal thoughts, and nothing about his behavior indicated a suicidal inclination or anything unusual. Furthermore, there was nothing different or unusual about his behavior, attitude, or conduct on this occasion as compared to the numerous prior times when David was arrested and booked into jail.

At the Itawamba County jail, the duties of radio dispatcher and jailer were performed by one officer. On the afternoon in question, Officer Terry Jones was on duty. According to Officer Jones and Officer Knight, David Hood was placed in a cell in the "old part" of the jail, and he was the only prisoner in this section. There were six cells in this particular block which open into a long hallway; and, Officer Jones testified that from his position in the dispatch room, he could observe one or two cells through a glass plate in the door. Officer Knight stated that the dispatcher could see the corner of the cell where David was placed. Officer Jones testified that he, "saw movement back there a couple of times," in the area where David

was confined; however, he could not remember the last time that he saw movement in the area. At 6:00 p.m., Officer Jones entered the cell block to deliver David Hood's supper. Officer Jones discovered David Hood hanging from the door frame of his cell with a ligature that Hood had fashioned from a bed sheet.[11] At the time of Hood's suicide death, Sheriff Leland Taylor was not at the jail, and he was unaware that David was in custody. Sheriff Taylor left the jail at 3:00 p.m. on this day and was at his home when he was notified by Officer Jones.

### Summary Judgment Standard

Summary judgment is appropriate only if the record reveals that there is no genuine issue as to any material fact and that the moving party (county) is entitled to a judgment as a matter of law. F.R.C.P. 56(c). The pleadings, depositions, admissions, and answers to interrogatories, together with any affidavits, must demonstrate that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Federal Sav. and Loan Ins. v. Kralj*, 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party (estate). *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). However, summary judgment is mandated after adequate discovery and upon proper motion against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### Requirements for § 1983 Liability upon the County

■ To impose liability upon the county pursuant to § 1983, the plaintiff must prove

---

**11.** Apparently, the door to Hood's cell was left open, and the cell opened into a locked hallway. The doors to the five remaining cells in the block were locked. Thus, Hood had access to his assigned cell and the hallway.

the following: (1) a policy (2) of the county's policymaker (3) that caused (4) the deceased to be subjected to a deprivation of a constitutional right. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987); *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 169 (5th Cir.1985); *Boston v. Lafayette County, Mississippi*, 743 F.Supp. 462, 467 (N.D.Miss.1990).

## I. Failure to Train

 The failure to provide pre-trial detainees with adequate protection from their **known** suicidal impulses is actionable.[12] *Evans v. City of Marlin, Texas*, 986 F.2d 104, 107–08 (5th Cir.1993); *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir.1992); *Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir.1990); *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1184 (5th Cir. 1986). Plaintiff's first theory of liability for the county is predicated upon a failure to train, or inadequate training to recognize the need for and to obtain medical care for arrestees with known suicidal tendencies. Inadequate police training will support liability under § 1983 where such a failure amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989); *Evans v. City of Marlin, Texas*, 986 F.2d 104, 107 (5th Cir.1993). In *Evans*, the Fifth Circuit summarized the basis of liability for failure to train in detainee suicide cases as follows:

A municipality should be required to provide its police officers with minimal training to detect **obvious** medical needs of detainees with **known, demonstrable,** and serious mental disorders. *Id.* at 104 (Emphasis supplied). Police personnel are not required to unerringly detect suicidal tendencies; such an exacting standard requires the skills of an experienced medical professional with psychiatric training.... *Id.* Recognizing these practical realities, the *Burns* court held that detainees have no absolute right to a complete psychological examination. *Id.* Absent such a right, the failure to train custodial officials in screening procedures to detect **latent** suicidal tendencies does not rise to the level of a constitutional violation. *Id; cf. Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1184 (5th Cir.1986) (§ 1983 liability may exist where suicidal tendencies **obvious** to arresting officers).

*Evans,* 986 F.2d at 107.[13]

In order for the claim of failure to train (inadequate training) to survive, plaintiff must show that the decedent experienced a violation of a constitutional right. *Evans*, 986 F.2d at 108. The constitutional violation requires the presence of a **known** suicidal impulse, and the absence of a known suicidal impulse or suicidal tendency yields no constitutional deprivation on a failure to train theory of liability. In *Evans*, the decedent exhibited no behavior or conduct which would have served as an indication that she was suicidal:

Here there was no indication that Verna Rae Evans would take her own life. The officers' affidavits showed that the Decedent did not exhibit any apparent suicidal behavior on the night of her death, and that she had been in the Marlin City Jail on prior occasions and had never exhibited such an inclination. R. at 153 (affidavit of

---

12. This duty stems from the Eighth and Fourteenth Amendment standard of care employed in the *Estelle* line of cases. "A § 1983 claim may lie when a prisoner's **obviously** serious medical needs are met with 'deliberate indifference' by officials." *Evans v. City of Marlin, Texas*, 986 F.2d 104, 107 (5th Cir.1993), citing *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). *See Burns v. City of Galveston*, 905 F.2d 100, 103 (5th Cir.1990) (although right is based on Eighth Amendment, detainees are accorded at least as much protection under due process clause of Fourteenth Amendment).

13. A claim of inadequate police training in another detainee suicide case was recently visited by the undersigned in a case styled *Hare, et al. v. City of Corinth, et al*, 814 F.Supp. 1312, 1325 (N.D.Miss.1993). In *Hare*, this court discussed the Fifth Circuit position on a "failure to train" theory of liability in detainee suicide cases. That is, in the absence of a known, demonstrable mental disorder, a detainee's right to adequate medical care does not include an absolute right to psychological screening. *Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir.1990); *Hare*, 814 F.Supp. 1312.

Peter Otholt); R. at 175 (affidavit of Randy Trice). The Appellant did not controvert this evidence. In the absence of any manifest signs that the Decedent was a danger to herself, the city's failure to train police personnel to detect potential suicidal impulses does not give rise to a deprivation of constitutional rights. *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir.1992); *Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir.1990).

*Evans*, 986 F.2d at 108.

In the case *sub judice*, the deposition testimony of Officers Knight and Jones reveals that there was no indication on November 6, 1990, that David Hood harbored any suicidal thoughts or inclinations. No behavior was manifested which would give reason for any concern that Mr. Hood might do harm to himself on that day. This evidence is uncontroverted in the record. After being arrested on the assault warrant, Hood obviously displayed some anger over his girlfriend leaving him for another boy. However, there was nothing else that was "rememberable" in either his statements, behavior, or gestures. In affidavits submitted by Officers Jones and Knight, both officers stated that David acted and looked no differently on November 6th than the other times when he was drunk and confined in jail.

On summary judgment, however, the court reviews the facts and all reasonable inferences in favor of the non-movant. In this regard, the court considers the affidavit and testimony of David's father, Larry Hood, and the testimony of David's grandmother, Pauline Hood. In Mr. Hood's affidavit, he stated that he specifically remembered telling Sheriff Taylor on more than one occasion that David had threatened to kill himself. In his deposition, Mr. Hood was asked about the specific times when he had apprised the sheriff of this information:

Q. —that said that on more than one occasion prior to David's death you told Sheriff Taylor that David had threatened to kill himself ... How many times did you do it during the years '88, '89, and '90 which you mentioned in your affidavit?

A. I noticed two or three different times over there at the jail.

Q. All right, sir. Let me take you to the first time, please, through this with me. Take the first time and tell me about a date.

A. I can't remember.

Q. Tell me about a year.

A. I guess it's the first year that we had trouble with him.

Q. What would that be?

A. I guess right after—you know, wasn't right after the accident, been about a year after the accident. What was the accident, '87? I guess it would have been—

Q. A year after the accident?

A. Yeah, a year after the accident.

 \* \* \* \* \* \*

Q. And you can't pinpoint the reason for being there that time, the first time that you told him about David threatening suicide?

A. Not exactly. Not to tell you exactly what date it was.

Larry Hood Dep. at 22–23.

In addition to Larry Hood's affidavit and testimony, David's grandmother testified at her deposition that on one occasion she informed Sheriff Taylor that David had threatened to kill himself.

Q. Did you ever tell the Sheriff's Department or the Sheriff about him threatening?

A. Uh-huh.

Q. You, yourself, did?

A. Uh-huh. (Witness nods head affirmatively.)

Q. When, please, ma'am?

A. Well, one time when we had them to pick him up, and I was talking to Leland, and I told him that. He said, 'Oh, he ain't going to hurt hisself.'

Q. Was this one of the times that you filed the mental health proceedings?

A. Uh-huh.

Q. Was there ever any other time that you had mentioned it to him?

A. No, not that I know of.

Pauline Hood Dep. at 24.

In sharp contrast to the assertions of David's father and grandmother, Sheriff Tay-

lor testified that he was unaware of any concerns about David entertaining suicidal thoughts. Although the sheriff testified that he was aware that David had been involved in a motorcycle accident, he was unaware that David suffered emotional problems as a result of a head injury from the accident. Consequently, Sheriff Taylor had never issued any special instructions to his deputies regarding the custodial care of David Hood. As noted in the statement of facts, the sheriff and deputies were aware of the two commitment proceedings on David, but they alleged they were unaware of the underlying reasons for it. The testimony of David's father and grandmother cannot be reconciled with Sheriff Taylor's testimony. As noted above, the court reviews the facts and takes all reasonable inferences in favor of the non-movant on consideration of a summary judgment motion. For the limited purpose of plaintiff's claim on summary judgment, the undersigned accepts the testimony of David's father and grandmother that they had mentioned David's past statements about suicide to Sheriff Taylor. In so doing, the court observes that Ms. Hood testified that she informed the sheriff of this information (suicidal thoughts) in connection with one of the commitment proceedings. Thus, it would have been either March or August of 1988. David hung himself over two years later in November of 1990, *after* he had received treatment from the state hospital. Mr. Hood could not remember when he told the sheriff that David had mentioned suicide. The undersigned is not qualified and categorically declines to speculate as to when the "statute of limitations" might run on such information when it is provided to law enforcement officials. As a matter of common sense and experience, it would seem that a mental health professional would be interested in knowing the source of the information, the context in which it is offered to the authorities, and anything that might have intervened between the time the information was supplied and until it became important. In

instances such as the case *sub judice*, where the decedent exhibits no behavior or conduct indicative of suicidal tendencies or inclinations just prior to death, such information as alleged by the Hoods becomes extremely important. This is so since the case law clearly instructs that the threshold requirement is to show that a defendant failed to provide a detainee adequate protection from a **known**[14] suicidal tendency or impulse. *Evans*, 986 F.2d at 107–08; *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir.1992); *Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir.1990); *Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1188 (5th Cir.1986). And, while the case law is clear on the requirement for maintaining a § 1983 claim, there is no clear guidance or easy determination as to **when** (how much or at what point) a suicidal tendency or impulse becomes **known** (or should become known) to a law enforcement official. For the reasons stated, however, the court moves forward with plaintiff's claim, though with some reluctance and reservation, with the assumption[15] that David Dwayne Hood was a detainee with a "known" suicidal tendency.

To support a claim of a policy of inadequate training, the plaintiff serves a potpourri of allegations. First, the plaintiff offers the fact that in March of 1988, two and a half (2½) years prior to Hood's suicide, another suicide death occurred in the Itawamba County jail. Although the record in the case *sub judice* presents few details concerning the prior suicide, the March 1988 suicide is apparently offered as *res ipsa loquitur* inferential evidence of a policy of inadequate training when considered with the suicide of plaintiff's decedent. Plaintiff's claim of inadequate training also includes an allegation of inadequate funding and staffing of the county jail by county officials. In this vein, plaintiff asserts that the duties of jailer and dispatch-

---

**14.** The test is known suicidal tendency or impulse or one which *should have been known*. *Lewis v. Parish of Terrebonne*, 894 F.2d 142, 146 (5th Cir.1990).

**15.** The court is mindful that an inherent counterpart to this assumption is that a duty might have existed for Sheriff Taylor to inform his deputies that David Dwayne Hood should be considered "suicidal" given the frequency in which they were in contact with David.

er should have been divided into two jobs performed by different people.

Establishing a claim of inadequate training under § 1983 is a most formidable task. An allegation of inadequate training must be supported by evidence of a policy or custom which is the "moving force" of the constitutional violation." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978); *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir.1987); *Gagne v. City of Galveston*, 671 F.Supp. 1130 (S.D.Tex.1987). Ordinarily, inadequate training alone is not the moving force of injury because the police officer who "causes" the injury does not rely upon inadequate training as tacit approval of his conduct. *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir.1987); *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 169 (5th Cir.1985); *Gagne*, 671 F.Supp. at 1135. Regarding the element of causation, an isolated incident is not enough and not sufficient to show that a policy or custom exists. *Palmer*, 810 F.2d at 516. "Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy." *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir.1984) (en banc), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

Obviously, mere conclusory allegations of grossly inadequate training do not make out a case of deliberately indifferent policy. *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir.1992); *Rodriguez v. Avita*, 871 F.2d 552, 555 (5th Cir.), *cert. denied*, 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989). In order to be a policy, "inadequate training must be a product of a conscious choice." *Grandstaff v. City of Borger, Texas*, 767 F.2d 161, 169 (5th Cir.1985), citing *Tuttle*, 471 U.S. at 824 n. 7, 105 S.Ct. at 2436 n. 7.

Turning now to the facts at bar, the record reveals a failure on the part of plaintiff to support the allegations of a policy or custom of inadequate training, characteristic of deliberate indifference, as the moving force of a constitutional violation suffered by the plaintiff's decedent. First, the Itawamba Sheriff's Office did, in fact, have a policy with regard to the custodial confinement of detainees with who exhibited a possible inclination to self-injury. In the affidavit submitted by Sheriff Taylor, his policy, although oral and not written, was articulated as follows:

> Although there were no written policies and procedures in the Itawamba Jail concerning the special treatment to be given to inmates who:
>
> 1. threatened self injury and/or
>
> 2. were reported or observed to be drunk from alcohol and/or
>
> 3. were reported or observed to be drunk from or under the influence of narcotics or other controlled substances and/or
>
> 4. were reported or observed to be ill or in need of medical or health care and/or
>
> 5. were reported or observed to be in need of mental health services or were a threat to the health and/or safety of themselves or others, and/or
>
> others appearing to require special attention, there were, at all times of my term of office in the above capacity, my orally announced rules and regularly followed staff practices requiring:
>
> (A) regular drunks who showed no special or abnormal conduct or risk, were to be confined in blocks of cells with others, if possible and safe;
>
> (B) unknown drunks and unusual acting regulars were to be questioned and, if no abnormal response, conduct or indication, treated the same as (A); however, those indicating abnormality of lack of self protecting attitude, and if not possible or safe to put with other inmates, were to be placed where they could be continuously observed, or help was called and they were to be removed from jail; (C) while in the jail, all inmates were to be observed on an hourly basis; those inmates with special, health, mental health or other extraordinary problems were to be sent for professional services and, upon return, be observed on an as needed basis, but not less often than each thirty (30) minutes:
>
> (D) those persons threatening, reported to be considering or acting like they may

injure themselves or others, were too drunk to think right or may commit suicide, were to be:

i) provided appropriate professional services immediately or as soon as a professional was available, and the professional's orders were to be strictly followed;

ii) deprived of belts, shoe laces, sheets and other materials that could be used in a suicide attempt;

iii) removed from the jail as soon as possible, but, while there, kept under extremely close observation, being not less than each fifteen (15) minutes.

In addition to the affidavit of Sheriff Taylor, Officers Jones and Knight also submitted affidavits wherein they affirmed that the Sheriff's oral policy was indeed the policy of the department. At the depositions of Sheriff Taylor and Officers Knight and Jones, all three officers were asked about the oral policy. In his deposition, Sheriff Taylor stated that his policy with regard to detainees who were likely to present a risk of self-harm was to place them in cell 1 or 2, where they could be observed from the dispatch room. The sheriff also testified that following the March 1988 suicide, his department made "double sure that everything was taken off of them," referring to items of dangerous clothing such as belts and shoe laces. Officer Jones testified that the sheriff's policy with regard to a prisoner thought to be a danger of self-harm was to "take the proper precautions." In Officer Knight's deposition, plaintiff's attorney asked him about the sheriff's oral policies:

Q. Specifically, did Sheriff Leland Taylor ever enunciate or ever tell you, ever announce any oral policy in connection with the handling of prisoners or detainees who were known to have mental problems?

A. Yes, sir.

Q. And what was that policy?

A. Well, sir, the one who—that we observed, we—if we thought that they was going to be a problem, we would quickly as we could, either to get word to the chief deputy or to Sheriff Taylor himself and take proper measures, precautions for them—for this individual.

Q. And what would those measures be?

A. It was our policy, if we got to a scene where crimes were committed or an accident, if we believed that this individual needed medical assistance, before we took him into custody, we would dispatch an ambulance or proper medical personnel. If we observed someone in the jail that needed medical assistance or that was in a threatening or a violent manner to himself or anyone else, it was passed on to the sheriff and the necessary measures were taken.

Q. In connection with prisoners or detainees who had known mental problems, did Sheriff Taylor ever tell you any oral policy about dealing with those particular types of prisoners?

A. Would you repeat that one more time, please, sir.

BY MR. WALKER: Read it back for me, please.

BY THE COURT REPORTER: In connection with prisoners or detainees who had known mental problems, did Sheriff Taylor ever tell you any oral policy about dealing with those particular types of prisoners?

A. Those that were known to have mental problems?

Q. (Mr. Walker) Yes, sir.

A. Yes, sir.

Q. And what were—what were those policies?

A. They was to be kept in separate departments of the jail where they could be observed more closely than regular prisoners without a possibility of being a threat.

Q. Any other procedures in connection with those types of prisoners?

A. That was the basic of what we did, was to place them into a place where they could be better observed by the dispatcher or the jailer.

Q. Was there any time schedule that those particular types of prisoners were supposed to be observed?

A. Yes, sir, they was more routine than the other, the other prisoners was.

Q. Any particular time sequence you remember?

A. We had it from an hour, I believe on regular prisoners, to down to probably ten to 15 minutes. Some people we had to give medication. They were on a time schedule. The ones that was in threats, whatever, you know, they were the ones you checked on more frequently, say, ten to 15 minutes, 20 minutes apart, in that neighborhood.

Q. When did Sheriff Taylor tell you these policies?

A. When I went to work for Sheriff Taylor.

The primary attack that plaintiff launches on the sheriff's policies regarding detainees with known mental problems is that such policies were oral and were never written. The "not so subtle" suggestion is that since the policies were never committed to paper, perhaps such policies never existed. At most, this is nothing more than a bald assertion by plaintiff. The uncontroverted evidence in the record is that an oral policy existed regarding the safe custodial care of detainees with mental/emotional problems. Obviously, the better approach and best evidence of such policies would have been some written documentation [16] such as that contained in the affidavits of Sheriff Taylor and Officers Knight and Jones. However, in the absence of anything in the record to contradict, the court is unaware of any requirement or duty to reject and disbelieve the assertions of the officers that an oral policy existed and was understood by those charged with its implementation.[17] According to Sheriff Taylor, Itawamba had only four (4)

deputies. Therefore, oral communication of rules, policies, practices and procedures was not an ineffective means of dissemination.

Furthermore, Sheriff Taylor and Officers Jones and Knight were all graduates of the state law enforcement training academy. The sheriff estimated that in 1972, when he attended the academy, approximately one day was devoted to control of prisoners and safe custodial confinement. All three officers had attended various continuing education seminars in law enforcement, although no one had attended a seminar on the specific subject of jailhouse suicide prevention. There is "no per se rule that a county is deliberately indifferent" to training when it "relies exclusively on state certification requirements to ensure that its deputies are adequately trained." *Benavides v. County of Wilson*, 955 F.2d 968, 974 (5th Cir.1992). Additionally, the plaintiff's conclusory allegations of inadequate staffing and funding will not support § 1983 liability against the city. Evidence of understaffing, without more, is not proof of official policy.[18] *Anderson v. City of Atlanta*, 778 F.2d 678, 687 (11th Cir.1985); *Gagne v. City of Galveston*, 671 F.Supp. 1130, 1135 (S.D.Tex.1987).

On the failure to train (inadequate training) theory of liability, plaintiff has failed to make a sufficient showing to establish the existence of several essential elements on which plaintiff would bear the burden of proof at trial. There is no genuine issue of fact from which a trier of fact could conclude that Itawamba County had a custom or policy of inadequately training its law enforcement officers, as a consequence of deliberate indifference, to provide safe custodial con-

**16.** The sheriff's office did have written policies and procedures on a wide range of topics, but none addressed custodial care of detainees with known mental problems. Some areas covered by written policies included officer ethics and discipline, special instructions for various arrest situations, use of police weapons, handling of juveniles, handling of mail, disciplinary procedures for prisoners, etc.

**17.** *See* F.R.C.P. 56(e).

Plaintiff has submitted an expert affidavit of Dr. George L. Kirkham. Dr. Kirkham's affidavit lashes sharp criticism with the existence of oral policies which he alleges can be easily misunderstood, misinterpreted or forgotten. Common

sense and experience teaches that Dr. Kirkham's point is a valid one. Yet, the court is strained to conclude that the failure to commit such policies to paper is indicative of a mindset of deliberate indifference. At best, the failure to put the policy in writing might amount to simple negligence.

**18.** Sheriff Taylor, as chief policymaker for the county jail, was not deliberately indifferent to his staffing requirements. The sheriff had made an attempt to get additional funding to hire an extra officer to assist with the duties of jailer/dispatcher. He was unsuccessful in obtaining the funding. Taylor Dep. at 50–51.

finement and proper medical treatment to detainees with known suicidal tendencies; and, such failure to train was the moving force in causing the plaintiff's decedent a denial of his Fourteenth Amendment due process rights. Viewing the record in the light most favorable to the plaintiff, the evidence shows negligence on the part of Officers Knight and Jones for placing David Hood in a cell in which he could not be observed from the dispatch room and negligence by Officer Jones for not checking on Hood every 10 to 20 minutes. For the reasons explained above, such negligence on the part of an officer (or officers) in this instance falls short of a policy by a county policymaker indicative of deliberate indifference. Consequently, the county's summary judgment motion on plaintiff's claim of failure to train is well taken.

## II. Failure to Adopt Policy for Safe Custodial Care of Suicidal Detainees & Failure to Adopt Policy of Furnishing Medical Care to Suicidal Detainees

Plaintiff's second and third claims of liability offer considerable overlap with the failure to train theory of liability, and much of the discussion which appears above is applicable to plaintiff's remaining federal claims. The failure to promulgate policy must amount to "an intentional choice, not merely an unintentionally negligent oversight." *Evans v. City of Marlin, Texas*, 986 F.2d 104, 108 (5th Cir.1993), citing, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992). And, the failure to adopt a policy rises to the level of deliberate indifference "when it is obvious that the likely conse-

quences of not adopting a policy will be a deprivation of civil rights." *Evans*, 986 F.2d at 108; *Rhyne*, 973 F.2d at 392.

■ Itawamba County had policies in place for the safe incarceration of prisoners who exhibit suicidal tendencies. The policy included placing the detainee in a cell where he could be observed by the dispatcher in the radio room and 10 to 20 minute checks on the prisoner. Such detainees were to be deprived of belts, shoe laces, sheets and other materials which could be used in a suicide attempt. These policies were not followed on the day of David Hood's death.[19] Had the policies been followed, David would have been placed in a cell which allowed for better observation by the dispatcher, and he would have been checked at scheduled intervals. Viewed in the best light for plaintiff, the evidence indicates negligence of a county law officer [20] for not adhering to county policy for the custodial care of David Hood. *Rhyne*, 973 F.2d at 392. Such a negligent act does not support liability under § 1983. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). The unfortunate facts concerning the death of David Hood clearly show that it was the deviation from policy and standard practice that contributed to Hood's death, not the policy or practice itself.[21] There is nothing to suggest a "policy making endeavor" characteristic of deliberate indifference. See *Evans*, 986 F.2d at 108; *Rhyne*, 973 F.2d at 392. Therefore, plaintiff's claims based upon the failure to adopt/promulgate policy must fail for many of the same reasons which doomed the failure to train claim of liability.

---

19. As a reminder, the undersigned evaluates this claim under the "assumption" that David Hood was a detainee with **known** suicidal tendencies. Of, course, this fact is hotly contested by the county-defendant. For summary judgment purposes only, this court views the evidence in the light most favorable to the plaintiff. As explained in this opinion, this means that the court accepts the affidavit and deposition testimony of David's father and grandmother that they told Sheriff Taylor that David had threatened suicide.

20. For § 1983 purposes, a municipality (i.e., political subdivision) may not be held strictly liable for the acts of its non-policy-making employees

under a *respondeat superior* theory. *Oklahoma City v. Tuttle*, 471 U.S. 808, 817–18, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992).

21. *See Boston v. Lafayette County, Mississippi*, 743 F.Supp. 462, 475 (N.D.Miss.1990) (because no county policy was "moving force" behind Boston's unfortunate death, county cannot be liable under § 1983).

### III. The State Law Claims

In the complaint filed in this court, plaintiff also asserts a state law claim pursuant to the Mississippi Wrongful Death Statute, *Miss. Code Ann.* § 11–7–13 (Supp.1992). Larry Hood, plaintiff in this case and as Administrator of the Estate of David Dwayne Hood, has filed a civil action in the Itawamba County Circuit Court wherein Leland Taylor, ex-sheriff, is named as defendant. Federal court jurisdiction over supplemental state claims is governed by 28 U.S.C. § 1367, which provides that:

> in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a) (Supp.1992).

Pursuant to § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim in subsection (a) if the district court has dismissed all claims over which it has original jurisdiction. *See Rhyne v. Henderson County,* 973 F.2d 386, 395 (5th Cir.1992). Since this court has dismissed all of the federal questions which gave it original jurisdiction, the state law claims pending before this court will be dismissed without prejudice, and such claims may proceed in the usual manner pursuant to state court practice and procedure. In so doing, the court expresses no opinion on the state law claims.

### Conclusion

In conclusion, the county's motion for summary judgment on the federal cause of action based upon 42 U.S.C. § 1983 will be granted for the reasons stated in this memorandum opinion. The state claims will be dismissed without prejudice.