Dorothy BURNS, Individually and as the Heir at Law of Leonard Michael Morea, Deceased, Plaintiff–Appellant,

v.

The CITY OF GALVESTON, TEXAS, Defendant–Appellee.

No. 89–2510.

United States Court of Appeals, Fifth Circuit.

July 11, 1990.

Elsie I. Milosevich, Norwood J. Ruiz, Galveston, Tex., for plaintiff-appellant.

John Eckel, Mills, Shirley, Eckel & Bassett, Galveston, Tex., for defendant-appellee.

Before POLITZ, KING, and WILLIAMS, Circuit Judges.

POLITZ, Circuit Judge:

Following the suicide of Leonard Michael Morea while he was confined in the Galveston, Texas city jail, his mother, Dorothy Burns, invoked 42 U.S.C. § 1983 and sued the City of Galveston, claiming that city policies contributed to his tragic death. She now appeals an adverse summary judgment rejecting her federal demands. We affirm.

*Background*

In the early morning hours of June 17, 1987, Morea, accompanied by his stepfather and a friend, was out celebrating his 21st birthday when the trio were involved in a minor auto accident. Galveston police officer Matthew J. Stanich was dispatched to the scene, arriving just after 2:20 a.m. In his efforts to determine which of the three was the driver officer Stanich questioned Morea, who stated that his name was Leo Burns, but otherwise refused to answer questions. Morea appeared to be heavily intoxicated. Stanich arrested him for public intoxication and failure to identify and placed him in the patrol unit. Morea became belligerent, kicked the inside of the police car and said he needed to use a restroom. When officer Stanich told him they would be at the police station in a few minutes Morea calmed down.

Upon arrival at the station Morea was first taken to a restroom and then was brought to the booking area. Stanich began filling out the paperwork. Other officers present included Angela Crummett, the acting desk sergeant, Rose Tijerina, Carl Lomax, Oscar Robinson, and Don Grove. Two other detainees, Ronald Somners and Kenneth Yancey were awaiting booking.

During booking Morea gave his true name but otherwise refused to cooperate. When asked his weight he gave the grossly inflated figure of 550 pounds, and when asked if he had any scars or tattoos he disrobed. The two female officers present turned away and Morea was ordered to dress and he put his clothes back on. An effort by Stanich to complete a 10–question medical screening form was met by the same refusal to cooperate. The affidavits and depositions in the summary judgment record establish that all of the officers who observed Morea considered his behavior typical of an intoxicated detainee, and none viewed his conduct as reflective of mental illness or suicidal tendencies. Detainee Yancey echoed these observations.

At 3:10 a.m. Stanich placed Morea in a cell at the rear of the jail occupied by another detainee, David Wayne Harris. Morea asked Stanich for a cigarette and was told that smoking was not allowed. Stanich returned to the booking area. According to Harris, Morea hollered for a cigarette, saying that if he did not get one he would kill himself.

The noise level in the jail that night was heightened because of the use of several noisy fire department smoke ejector fans made necessary when the jail's air conditioning unit failed. The officers in the booking area stated that although they could hear Morea yelling, they could not understand what he was saying.

Shortly after Morea was placed in the cell his mother called the police station and spoke to Stanich. He informed her that her son appeared to be drunk and was making a lot of noise. Mrs. Burns did not appear to be disturbed by this information and she gave the officer no reason to believe that Morea had any mental problems or suicidal tendencies. In her deposition she confirmed that her son had never exhibited any sign or given any indication that he may have been suicidal. After telling Mrs. Burns the procedure for securing her son's release from detention, officer Stanich went upstairs to run a criminal history check on Morea. He left the jail around 3:45 a.m.

Harris attested that after Morea was placed in the cell he beat on the walls and hollered at the officers for a cigarette. Harris turned away and dozed off. A little later he awoke and saw Morea hanging by his blue jeans from the top bar of the rear wall of the cell. Believing Morea dead, Harris did not touch him. Instead he called out to the officers, who responded by telling him to be quiet. A few minutes later, at 4:00 a.m., officer Lomax discovered Morea while escorting detainees Somners and Yancey to the rear of the jail. Morea was immediately cut down and the emergency personnel were called. Their efforts to resuscitate Morea were unavailing. Morea was pronounced dead as of 4:07 a.m.

Morea's was not the first suicide in the Galveston city jail. In May 1983 a male detainee hanged himself with his belt. In 1985 a female detainee hanged herself with her blouse. The City, through its police chief to whom it had delegated the authority to promulgate departmental policies and procedures, responded to each by adopting written policies emphasizing the personal welfare of detainees. After the first suicide an hourly check of each cell was instituted. After the second, the police began to maintain records of each instance in which a detainee indicated a tendency toward self-injury. By January 1987, six months before Morea's death, the police department had issued a revised and updated manual that contained procedures for the medical screening of detainees, including questions designed to detect those with possible suicidal tendencies, and detailed special precautions to be taken with respect to such detainees.

Mrs. Burns filed the instant suit in Texas state court asserting causes of action under 42 U.S.C. § 1983 and state law. She alleges that despite its written policies the City had a custom of deliberate indifference toward the medical needs of suicidal detainees and a policy of inadequately training its officers in its medical procedures. The City removed the case to federal court and moved for summary judgment. Finding from the summary judgment record that Burns had failed to establish a municipal policy or custom of deliberate indifference to the medical needs of suicidal detainees, or a policy or custom of inadequately training its police officers, the district court dismissed the federal claim and remanded the state claims. Burns timely appealed.

### Analysis

To establish municipal liability under section 1983, a complainant must demonstrate a policy or custom which causes or occasions a constitutional deprivation. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984) (en banc), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); *Webster v. City of Houston*, 735 F.2d 838 (5th Cir.) (en banc), *reh'g granted in part, denied in part*, 739 F.2d 993 (5th Cir.1984) (en banc); *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). Municipal liability under section 1983 is not based on respondeat superior. Rather,

[it] attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).

■ Burns maintains that Morea's suicide was the direct result of the City's deliberate indifference toward his serious medical needs. The right of convicted prisoners not to have serious medical needs treated with deliberate indifference was established in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although this right, as applied to convicted prisoners, is based on the eighth amendment, state and municipal detainees are accorded at least as much protection under the due process clause of the fourteenth amendment. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

■ In *Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182 (5th Cir.1986), we recognized that, in a Fed. R.Civ.P. 12(b)(6) setting, just as deliberate indifference to a pretrial detainee's serious physical medical needs may constitute a due process violation, so too may failure to take the steps necessary to protect against a detainee's suicidal tendencies. Under *Partridge,* therefore, municipal liability may be premised on a policy or custom that fairly may be said to have been the cause of or a significant contributing factor to a suicide. Burns seeks to establish such in the case at bar by two related but conceptually distinct claims. The first is based on a claimed failure of the officers to make the hourly cell checks called for by the department's formal procedures. The second relates to claimed inadequate training of the officers.

■ Burns contends that the written policy requiring that the cells of detainees be checked visually at hourly intervals was not observed. The policy requires that each cell be checked hourly and the dispatcher notified and the check logged. Burns offered a compilation of records from the dispatcher's log book for the six months preceding Morea's suicide. Only 152 cell checks were logged during that period; none were logged during the 24 hours preceding Morea's death. Burns contends that this evidence suffices to defeat the City's motion for summary judgment. We do not agree. Despite the officers' failure to notify the dispatcher, or the dispatcher's failure to log, the evidence establishes that the required periodic checks were in fact made the night of Morea's death. Further, checking at hourly intervals would not have prevented Morea's act. Morea was placed in the cell at 3:10 a.m. It was less than an hour later when officer Lomax found him dead. The summary judgment evidence establishes that Morea died within four minutes of hanging himself. In *Roberts v. City of Troy,* 773 F.2d 720 (6th Cir.1985), our Sixth Circuit colleagues found that the failure to make hourly checks of detainees could not be the proximate cause of a suicide by hanging where the evidence reflected that the detainee had been escorted to the telephone to speak with his mother less than 60 minutes before he was found dead. If compliance with the City's policy of hourly visual cell checks would not have prevented Morea's suicide, the failure to comply with the policy could not have caused or contributed to his death.

■ Burns's second challenge is based on the training of the officers, or lack thereof. She maintains that her son was denied his constitutional right to appropriate medical care as the result of a City practice or custom of inadequately training its police officers in its medical screening and suicide detection procedures. We have recognized that liability under section 1983 may be premised upon inadequate training, *see, e.g., Languirand v. Hayden,* 717 F.2d 220 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984), a theory of liability recently upheld by the Supreme Court. In *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103

**104**

L.Ed.2d 412 (1989), the Court held that inadequate police training will support liability under section 1983 where such failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at ——, 109 S.Ct. at 1204, 103 L.Ed.2d at 426.

Taken in its most favorable light, Burns's complaint is that the City failed to train its police officers and implement the medical-psychological screening procedures contained in its revised 1987 manual. As evidence of the City's alleged deliberate indifference Burns emphasizes that the 1987 manual contained a sample medical-psychological screening questionnaire far more detailed than that actually used. Further, she contends that although the police department required that the officers read and familiarize themselves with the revised manual, no formal classroom sessions were conducted to assure their understanding of its contents.

Failure to train police officers in screening procedures geared toward detection of detainees with suicidal tendencies may rise to the level of a constitutional deprivation only if the right of detainees to adequate medical care includes an absolute right to psychological screening. We perceive no such right. *Gamble* involved allegations that jailers were ignoring the requests for medical care of a prisoner who manifested serious physical problems. *Partridge*'s extension of *Gamble* to psychological or psychiatric conditions was based on allegations that the detainee in question had become hysterical during questioning, the police had been informed by the detainee's father that the detainee had suffered a nervous breakdown, and the detainee's clinical records from a prior confinement included a notation that he had attempted suicide then. Under those circumstances, the *Partridge* court held that a complaint alleging that the city and police department had failed to "adequately train the jail personnel to handle arrested citizens with *known* mental problems" could arguably be the basis for finding a municipal custom of deliberate indifference to a citizen's constitutional rights. *Partridge*, 791 F.2d at 1188 (emphasis added).

It is one thing to require a municipality to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious mental disorders. It is quite another to require as a constitutional minimum that a municipality train its officers to medically screen each pretrial detainee so that the officers will unerringly detect suicidal tendencies. The latter requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police officer by the due process clause. *Cf. Danese v. Asman*, 875 F.2d 1239 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990) (officers entitled to qualified immunity inasmuch as the right to adequate medical care did not create a constitutional duty to screen detainees for suicidal tendencies); *Belcher v. Oliver*, 898 F.2d 32 (4th Cir.1990) (same).

The judgment of the district court is AFFIRMED.