Linda **BARNEY**, Mother of Tjuana Barney, Deceased, Administratrix of the Estate of Tjuana Barney and Personal Representative for the Benefit of All Persons Entitled Under the Law to Recover for the Wrongful Death of Tjuana Barney, Plaintiffs,

v.

The **CITY OF GREENVILLE, MISSISSIPPI,** M.E. Waldrop, Former Chief of Police of the City of Greenville, Mississippi, Defendants.

No. 4:92cv130–S–O.

United States District Court,
N.D. Mississippi,
Greenville Division.

Sept. 6, 1995.

Charles Victor McTeer, Greenville, MS, for Plaintiffs.

Susan F. Desmond and Gary E. Friedman, Phelps Dunbar, Jackson, MS, for Defendants.

## OPINION

SENTER, Chief Judge.

This case arose out of a tragic chain of events (that ultimately began at Tjuana Barney's birth) and culminated with her suicide in a jail cell on her fourteenth birthday. The plaintiff, mother of the deceased and administratrix of the estate, alleges causes of action against Greenville, Mississippi, and M.E. Waldrop, Greenville's former police

chief, under 42 U.S.C. § 1983, as well as supplemental state law wrongful death and negligence claims.[1] Presently before this court are two motions for summary judgment, both filed by defendants. The first motion regards the original complaint, and the second motion is in response to plaintiff's first amended complaint. The evidence submitted is reviewed in the light most favorable to the plaintiff.

## I. FACTS

Tjuana Barney was arrested on May 24, 1989, for shoplifting a pair of underwear at Bargain Town in Greenville, Mississippi. Prior to placing Tjuana in a cell, the arresting officer, Susan Graziosi, performed a medical screening in which Tjuana was asked a variety of questions pertaining to her medical history and psychological condition. During this procedure, Graziosi specifically asked Tjuana if she was suicidal. Tjuana replied that she was not. Although it is alleged that certain county social workers knew that Tjuana was mentally disturbed,[2] Graziosi did not note any symptoms of mental anguish or distress.

Subsequent to the medical screening, the officer followed municipal policy and contacted Tjuana's youth court counselor, Shirley Byars. Upon being advised of Tjuana's situation, Ms. Byars told the officer to release Tjuana to her guardian. The youth court had previously removed Tjuana from the custody of her mother, the plaintiff in the instant case, and appointed Tjuana's grandmother as her guardian. The officer then contacted Tjuana's grandmother, who refused the police department's offer to release the child. Although Tjuana was technically free to leave, the police could not release her absent her guardian's consent and supervision. The police resultingly determined that

the most favorable option under the circumstances was temporary detainment. However, Tjuana could not be placed in the youth detention facility because it was filled with boys. Youth Court Judge Roger Wasson had issued standing orders that the police must house juvenile females in the Greenville city jail if the youth center was filled to capacity with males. This measure was intended to alleviate the concerns associated with detaining males and females together. Thus, Tjuana was detained in the juvenile section of the adult jail facility where she remained until she hung herself four days later.

## II. ANALYSIS

■■■■■ On a motion for summary judgment, the court must ascertain whether there is a genuine issue of material fact. Fed. R.Civ.P. 56(c). This requires the court to evaluate "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The United States Supreme Court has stated that "this standard mirrors the standard for a directed verdict ... which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12 (citation omitted). Further, the Court has noted that the "genuine issue" summary judgment standard is very similar to the "reasonable jury" directed verdict standard, the primary difference between the two be-

---

1. The original complaint named various "John Doe" defendants as additional parties. It is unclear as to whether plaintiff currently intends to maintain a cause of action against such unknown defendants. Notwithstanding plaintiff's intentions, she did not seek to amend her complaint to substitute actual individuals for the "Doe" parties within a reasonable time following the close of discovery. The pretrial Scheduling Order specifically required joinder of additional parties by April 23, 1993. These designations are therefore

disregarded. *See Williams v. Lower Merion Twp.,* 1995 WL 461246 (E.D.Pa.1995); *Rodriguez v. Passaic,* 730 F.Supp. 1314, 1319 n. 7 (D.N.J. 1990).

2. Tjuana's mental instability was evidenced by her frequent attempts to run away from home and the fact that since the age of ten, her father had often forced her to engage in both oral and vaginal intercourse.

ing procedural, not substantive. *Id.* at 251, 106 S.Ct. at 2512. "In essence ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' " *Id.* at 252, 106 S.Ct. at 2512 (citation omitted). The facts are reviewed drawing all reasonable inferences in favor of the nonmoving party. *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). However, summary judgment is mandated after adequate discovery and upon proper motion against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. City of Greenville, Mississippi

■ To impose liability upon a municipality pursuant to § 1983, a plaintiff must prove: (1) a policy (2) of the city's policymaker (3) that caused (4) the deceased to be subjected to a deprivation of a constitutional right. *Boston v. Lafayette County*, 743 F.Supp. 462, 467 (N.D.Miss.1990). Plaintiff bases the city's alleged liability on two policies: the placement of female juveniles in jail as opposed to the youth detention center, and the level of care provided to detainees with regard to the intended prevention of suicides.

■ The law is well established that municipalities are potentially liable for the policies and customs that they consciously and purposefully adopt. *Burns v. Galveston*, 905 F.2d 100, 103 (5th Cir.1990). However, the judicial waters are considerably more murky as to the proper standard under which a policy should be scrutinized. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that pretrial detainees are shielded by a Fourteenth Amendment due process right to be free from punishment, as opposed to the less broad Eighth Amendment protection against cruel and unusual punishment owed to convicted prisoners. In order to satisfy *Wolfish* and thereby not constitute punishment, the conditions of pretrial detainment must be reasonably related to a legitimate governmental objective. 441 U.S. at 539, 99 S.Ct. at 1874.

Although the Fifth Circuit has applied this standard in numerous instances analogous to the case at bar, the Appeals Court recently granted en banc review to reconsider the issue. *See Hare v. City of Corinth*, 36 F.3d 412 (5th Cir.1994). Because it is possible that the Fifth Circuit will choose to apply the "deliberate indifference" standard as adopted in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), this court will apply both the *Estelle* standard as well as the more sweeping "reasonable relationship" standard from *Wolfish*. Therefore, regardless of the recent confusion, the alternative application at this juncture of the most stringent legal standard ensures that the plaintiff's claims are afforded the greatest protection that the Fifth Circuit may deem appropriate.

1.

■ Plaintiff maintains that Greenville's policy of placing juvenile females in jail, the "least hospitable custodial environment," violated Tjuana's constitutional rights.[3] This policy was apparently promulgated by Judge Wasson and required female detainees to be

---

**3.** The plaintiff included in her complaint an alleged violation of the procedural due process clause. However, it is not apparent how Tjuana was deprived of her procedural due process rights, as there was no evidence to support such an allegation. The essence of plaintiff's charge is that the city provided Tjuana inappropriate conditions of detainment, not that she was deprived of sufficient procedural safeguards. *See Boston*, 743 F.Supp. at 472. Therefore, the court will construe plaintiff's argument accordingly.

placed in the city jail for their own protection when the youth detention center was full of males. As Greenville adopted this policy in an attempt to provide the safest manner of detaining juvenile females, the court finds that the practice was reasonably related to a legitimate government objective.

Moreover, no controverting evidence was presented that these policies were implemented with deliberate indifference to the needs of detainees such as Tjuana. Greenville did not disregard an obvious risk when it began housing juvenile females in the jail, particularly because the policy's express goal was to protect the females. *See Farmer v. Brennan,* — U.S. ——, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994) (holding that municipality must ignore obvious need in order to violate deliberate indifference standard). The court finds that this housing and detainment policy was imposed for the legitimate government interest of providing for the girl's protection, thereby satisfying *Wolfish,* and was not designed with deliberate indifference to her health and safety needs, in accordance with *Estelle.* Thus, at the time of Tjuana's death, the use of separate jail facilities for the temporary detention of juveniles, particularly when done pursuant to a court order and implemented with the express goal of providing for the child's safety and best interests, was not unconstitutional.

Plaintiff further alleges that the policy of placing juvenile females in jail cells constituted race and gender discrimination in violation of the equal protection clause of the Fourteenth Amendment. However, the record is devoid of any facts that support such an allegation. Although Greenville's policy is facially discriminatory, the U.S. Supreme Court has held that the Equal Protection Clause does not "demand that a [policy] necessarily apply equally to all persons." *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (citations omitted). Similarly, the Supreme Court has consistently upheld gender classifications where the distinction was not invidious, "but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M.,* 450 U.S. at 469, 101 S.Ct. at 1204. In examining the policy, it must be determined whether it is substantially related to a sufficiently important government interest. *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 441, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985); *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). This court determined above that in accordance with the due process clause, Greenville's policy bore a reasonable relationship to an important government interest. Although a gender-based equal protection claim requires the satisfaction of a more demanding standard, the court similarly holds that the gender classification imposed by Greenville's police and youth court officials is substantially related to the important government interest of protecting the health and safety of juvenile female detainees.

As to the issue of race, there was no evidence provided to support an allegation that housing determinations were in any way tainted by racial bias. Both equal protection claims are therefore found to be meritless.

### 2.

The second policy of which plaintiff complains involves Greenville's provision of medical care to detainees. This aspect of plaintiff's claim is predicated upon Greenville's alleged failure to provide Tjuana necessary medical care, as well as a failure to train its police officers to recognize the need for and obtain such care.

In regard to the alleged deprivation of care, the Fourteenth Amendment entitles pretrial detainees to a greater degree of medical care than the level guaranteed to convicted prisoners. *Rhyne v. Henderson County,* 973 F.2d 386, 391 (5th Cir.1992). To recover under § 1983, plaintiff must show that some municipal custom or policy caused the Greenville police department and jail staff to deprive Tjuana of reasonable medical protection from her own suicidal intentions. *Rhyne,* 973 F.2d at 392, (*citing Burns,* 905 F.2d at 102.) Plaintiff cannot prevail by showing that an officer or jail staff member failed to provide reasonable medical care, as § 1983 liability cannot be premised on vicarious liability or respondeat superior. *Okla-*

*homa City v. Tuttle,* 471 U.S. 808, 817–18, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985). It must be shown that the city of Greenville violated Tjuana's constitutional rights.

■ The evidence demonstrates that Greenville's policies mandated pre-detainment medical screening and that Tjuana's actual care would be supervised by a matron. The matron specifically testified that it was her custom as well as a staff practice to check on detainees such as Tjuana every fifteen to thirty minutes. Based upon these facts, the court finds as a matter of law that Greenville's policies neither deprived Tjuana of adequate medical assistance, nor violated the Fourteenth Amendment's required level of care. Thus, as to this policy, any evidence pertaining to insufficient medical care may only be considered as a potential violation of state tort law. *See Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (holding that negligent acts of government officials do not support § 1983 liability).

■ Alternatively, the failure to provide pretrial detainees with adequate protection from their *known* suicidal impulses is actionable under § 1983. *Rhyne,* 973 F.2d at 391 (*citing Burns,* 905 F.2d at 104). Plaintiff's argument is premised on the assumption that the police department knew of Tjuana's suicidal disposition and was thereby deliberately indifferent to her needs and necessary conditions of detainment. *See Farmer,* —— U.S. at ——, 114 S.Ct. at 1974 (holding that under deliberate indifference standard, municipality must have subjective knowledge of obvious constitutional violation).

■ In support of this allegation, plaintiff consistently argues throughout her complaint and memoranda that the police department was aware of Tjuana's suicidal impulses. However, the evidence provided to demonstrate this awareness is tenuous and largely inferential. While the facts must be judged in the light most favorable to the nonmovant, the plaintiff does carry the burden of coming forward with evidence that raises a material question of fact. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511. In her deposition, Ms. Barney stated that she assumed the police knew of Tjuana's disposition, but there is nothing in the record to substantiate her assumption.[4] Any allegation of police knowledge contrasts sharply with the deposition testimony of each police department official involved, as they all stated that they had no knowledge of Tjuana's suicidal impulses. Further, these allegations must be tempered with Ms. Barney's deposition testimony that she herself did not believe that Tjuana was disposed to harm herself:

Q: Prior to May 20, 1989, that is about the day she was arrested the last time, Tjuana was arrested—did you think or have any reason to believe that Tjuana was suicidal or would commit suicide?

A: No, I didn't.

Q: So up until the time of her death, up until the time that you were informed of Tjuana's death, did you have any reason to believe that she was suicidal or would commit suicide?

A: I—I've always felt that. But me and her always had a talk, and she promised that she wouldn't.

Q: So are you saying that you don't think she was suicidal?

A: Yes, sir.

Q: And that would hold true: You didn't think she was suicidal until the time you were informed that she had committed suicide.

A: Yes, sir.

\* \* \* \* \* \*

Q: Prior to Tjuana committing suicide, are you aware of any attempts she made at suicide?

---

4. Plaintiff alleges that the social workers assigned to Tjuana's care had knowledge of her dangerous mental state and therefore should have informed the police. However, Greenville's § 1983 liability must be premised upon an insufficient policy or the failure to adopt an appropriate policy. In this regard, Miss.Code Ann. § 43– 21–261 governs the communication of confidential information between youth court counselors and other officials. Because the state (and implicitly the city of Greenville) had adopted an applicable guideline, Greenville sufficiently disavowed itself of any liability regarding a lack of communication between individual officials.

A: No, sir.

Q: Are you aware of any threats she made to commit suicide?

A: No, sir.

Q: Are you aware of any doctor's or psychiatrists or psychologists or any people that have said that she is suicidal?

A: No, sir, no more than talking to my aunt.

\* \* \* \* \* \*

Q: What did your aunt say to you?

A: She said that she [Tjuana] said if she had to go back to jail again, she would kill herself.

Q: Did you tell anybody else that?

A: You mean the family?

Q: Yes.

A: No, sir.

Q: Police? Did you tell the police that?

A: No, sir.

Although Ms. Barney specifically testified that she did not believe Tjuana was suicidal, she also stated that she warned an unidentified police officer in 1981 and an unidentified police department desk worker in 1987 or 1988 that Tjuana was a suicide risk. While these statements must be accepted as true, the court finds that such vague assertions and conclusory allegations do not satisfy the nonmovants' burden in response to a summary judgment motion. *See also Evans v. Marlin*, 986 F.2d 104, 108 (5th Cir.1993) (finding that decedent exhibited no behavior or conduct that provided police indication of suicidal tendencies). Because the court has found that the care provided to Tjuana was sufficient absent evidence of police awareness of Tjuana's suicidal intent, maintaining the viability of the § 1983 claim requires a material question of fact as to the subjective knowledge of the police officials responsible for Tjuana's care. *See also Evans*, 986 F.2d at 107–08; *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1188 (5th Cir. 1986). No custodial officers were told of any suicide risk, and considering the evidence in the light most favorable to the plaintiff, Ms. Barney had not discussed the possibility of suicide with any officer in the department

within at least one year of Tjuana's death. Further, the record does not establish that Tjuana herself had ever attempted suicide, threatened to commit suicide, or exhibited any behavior indicative of one who has a suicidal inclination. Therefore, as there is insufficient evidence to convince a reasonable juror that those officers responsible for Tjuana's care knew of her alleged vulnerability to suicide, the court finds as a matter of law that there was no constitutional deprivation under either legal standard that could be premised upon Greenville's failure to provide medical care.

■ Plaintiff's remaining federal claim against Greenville involves the city's alleged failure to train its police officers. This theory of liability provides considerable overlap with the city's alleged failure to provide adequate medical care and can be discussed similarly. Taken in its most favorable light, plaintiff's claim alleges that Greenville's officers were inadequately trained and resultingly failed to detect and care for Tjuana's suicidal tendencies. However, as discussed above, there is no reasonable basis to conclude that anyone directly associated with the police department knew that Tjuana was a suicide risk. Absent such knowledge, the training Greenville's police officers received did not cause a constitutional deprivation of rights. As stated in *Burns:*

> It is one thing to require a municipality to train its police officers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious mental disorders. It is quite another to require as a constitutional minimum that a municipality train its officers to medically screen each pretrial detainee so that the officers will unerringly detect suicidal tendencies. The latter requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police officer by the due process clause.

905 F.2d at 104.

■ The record is insufficient to raise an issue of material fact as to the existence of a policy of inadequate training for the jail staff. An allegation of inadequate training must be supported by evidence of a policy or custom

which is the "moving force" of the constitutional violation. *Monell v. Dept. of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Palmer v. San Antonio,* 810 F.2d 514, 516 (5th Cir.1987). In this regard, there is no evidence that any incompetence was the result of inadequate training. Nor can it be inferred that additional training of the jail staff would have prevented Tjuana from taking her own life. Further, there was no basis to conclude that it was apparent to Greenville's policymakers that a constitutional violation would result from the training procedures they had imposed. *See Rhyne,* 973 F.2d at 393. A tragedy involving a child, such as the instant case, is insufficient to show that a constitutionally violative practice was in place. As stated by the Fifth Circuit, "isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy." *Bennett v. Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir.1984). Therefore, plaintiff's claim regarding a failure to train theory of liability is insufficient as a matter of law because it fails to establish the existence of certain essential elements on which plaintiff would bear the burden of proof at trial. There is no genuine issue of fact from which a reasonable juror could conclude that Greenville had a policy of inadequately training its police officers to provide safe custodial confinement and proper medical treatment to detainees, and that such failure to train was the moving force in causing a denial of Tjuana Barney's Fourteenth Amendment due process rights. Although a genuine issue of fact may perhaps exist as to whether Tjuana received adequate care from specific individuals not named in this cause of action, her care was not insufficient as a result of Greenville's jail and youth court policies.

### B. M.E. Waldrop, Former Greenville Chief of Police

■ Plaintiff next alleged that Chief Waldrop was individually liable for Tjuana's death. Police officers are shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct.

2727, 2739, 73 L.Ed.2d 396 (1982); *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir.1995). Chief Waldrop had only been police chief for eight days at the time of Tjuana's death and had no involvement in the policies or conduct that allegedly caused the suicide. In such an instance, the plaintiff must premise § 1983 liability upon some other act by the chief that caused the violation. *Boston,* 744 F.Supp. at 752. At the least, a causal connection must be established between Waldrop's actions and the alleged violation. *Barksdale v. King,* 699 F.2d 744, 746 (5th Cir.1983). However, as Chief Waldrop was not personally involved in the acts that purportedly caused the constitutional deprivation, there was no nexus between his actions and Tjuana's death. Therefore, qualified immunity bars this aspect of plaintiff's claim.

### C. The State Law Claims

■ In the complaint filed in this court, plaintiff also asserts state law claims based upon negligence and wrongful death. Federal court jurisdiction over supplemental state claims is governed by 28 U.S.C. § 1367, which provides that:

> In any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a) (Supp.1992).

Pursuant to § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim in subsection (a) if the district court has dismissed all claims over which it has original jurisdiction. *See Rhyne,* 973 F.2d at 395. Since this court has dismissed all of the federal claims that gave it original jurisdiction, the state law claims pending before this court will be dismissed without prejudice. In declining to exercise supplemental jurisdiction, it should be apparent that the court has not addressed the merits of the motions as they regard the state law claims. While the court desires to

bring this long-standing action to trial in a timely manner, it is not thought that such a dismissal to state court will harm plaintiff's interests.[5] One of plaintiff's attorneys of record recently requested a continuance based upon a scheduling conflict with the upcoming trial date. Unfortunately, it will be infeasible to set a new trial date in this court prior to the early spring of 1996. Partially in recognition of this concern and the fact that all parties have completed discovery and are trial-ready, the court dismisses this action with the hope that a new trial date can be set quickly in accordance with the state court's calendar. The Mississippi Legislature recently added another trial judge to the state court district that includes Greenville, which should result in a faster trial date in state court.

### III. Conclusion

Having carefully considered the evidence, the argument of counsel, and the applicable law, the court is of the opinion that no genuine issues of material fact exist with regard to the federal causes of action premised upon 42 U.S.C. § 1983. Thus, both motions are well taken, summary judgment is hereby granted, and the federal claims are dismissed with prejudice.

However, the court has declined to exercise its discretionary authority as it pertains to supplemental jurisdiction. Therefore, the merits of the state law causes of action have not been considered, and the state law claims are dismissed without prejudice.

An order in accordance with this opinion shall be issued.

### ORDER RELATED TO MOTIONS FOR SUMMARY JUDGMENT

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

The motion and supplemental motion for summary judgment as to the § 1983 claims are well taken, and those claims are dismissed with prejudice;

The court has declined to exercise supplemental jurisdiction as to the state law claims, and they are hereby dismissed without prejudice.

SO ORDERED.

---

5. 28 U.S.C. § 1367(d) alleviates any concerns pertaining to the statute of limitations.