The CITY OF GALVESTON,
Texas, Appellant,

v.

Dorothy BURNS, Individually and as the
Heir at Law of Leonard Michael
Morea, Deceased, Appellee.

No. 14–96–00360–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 31, 1997.

John Eckel, George W. Vie, III, Galveston, for appellant.

Norwood J. Ruiz, Elsie I. Schiro, Galveston, for appellee.

Before YATES, HUDSON and FOWLER, JJ.

## OPINION

FOWLER, Justice.

Dorothy Burns, individually and as the heir at law of Leonard Michael Morea filed suit under the Texas Tort Claims Act against the City of Galveston ("City") for (1) the negligent condition, use or non-use of tangible personal or real property and (2) negligent implementation of a discretionary act in

connection with the unfortunate death of her son who hanged himself while in the Galveston City jail. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021(2) and 101.056 (Vernon 1986). The City filed a motion for summary judgment contending it was immune from suit based on sovereign immunity, but the trial court denied the motion. We reverse the trial court's denial of the summary judgment and render judgment that Ms. Burns take nothing on her claims against the City.

## PROCEDURAL BACKGROUND

Ms. Burns, Morea's mother, filed the instant suit in state court asserting causes of action under 42 U.S.C. § 1983 and state law. She alleged that despite its written policies the City had a custom of deliberate indifference toward the medical needs of suicidal detainees and a policy of inadequately training its officers in its medical procedures. *Burns v. City of Galveston,* 905 F.2d 100, 101 (5th Cir.1990). The City removed the case to federal court and moved for summary judgment. The federal district court found that Ms. Burns had failed to establish a municipal policy or custom of deliberate indifference to the medical needs of suicidal detainees, or a policy or custom of inadequately training its police officers, *Id.* at 102, dismissed the federal claim, and remanded the state claims. *Id.*

The City then filed a motion for summary judgment in state court asserting that its officers were entitled to immunity as police officers and therefore, the City had sovereign immunity. The trial court denied the motion.

## FACTS

On June 17, 1987, Morea, his stepfather and a friend were out celebrating Morea's 21st birthday when they became involved in a minor accident. Officer Matthew J. Stanich arrived at the scene at approximately 2:20 a.m. When Officer Stanich questioned him, Morea was uncooperative, appeared to be extremely intoxicated and stated his name was Leo Burns. Stanich arrested him for public intoxication and failure to identify because Morea would not give him any information other than his name, then placed Morea in his patrol car. While in the patrol car, Morea became very belligerent; he kicked the inside of the police car and said he needed to use the restroom. At this point Stanich decided to take Morea to the police station.

Once they arrived at the police station, Officer Stanich took Morea to the booking area. Morea gave his true name, but otherwise refused to cooperate. In fact, Stanich was not able to complete a ten question medical screening form because Morea would not cooperate. At one point, Officer Stanich asked Morea if he had any scars or tattoos, whereupon Morea disrobed to show that he had none. In Officer Stanich's view, Morea's behavior was not highly unusual and was consistent with the actions of an intoxicated person. In fact Stanich had seen four or five other people disrobe when asked about scars or tattoos. Stanich did not view Morea's conduct as reflective of a mental illness or suicidal tendencies.

At approximately 3:10 a.m., Stanich placed Morea in a cell with another detainee, David Wayne Harris ("Harris"). Morea asked for a cigarette when Stanich placed him in the cell but Stanich told him he could not smoke. Moments later, Ms. Burns called the police station and talked to Officer Stanich to find out how to get her son out of jail. She did not tell Officer Stanich that her son was suicidal nor did she say he had any mental problems.

In the meantime, according to Morea's cellmate, Harris, who was reading a book, Morea yelled for a cigarette from his cell, and stated that if he did not get one he would kill himself. Morea beat on the walls and "hollered" for a cigarette. But, on this night, the air conditioner was not working and since it was very hot, smoke ejector fans from the fire department were running and generating so much noise that the officers up front could not hear and understand all the attempts at communication. Harris dozed off for a little while and awoke to find that Morea had hung himself with his blue jeans. Harris said he called for the officers but none came immediately. As Officer Lomax escorted two detainees to the rear of the jail, he heard Harris, still reading his book, say "Now do

you believe me? I told you" and saw Morea. Lomax got help and Morea was taken down. After efforts to revive him were unsuccessful, he was pronounced dead at 4:07 a.m.

Morea's was not the first suicide in the Galveston city jail. In fact, about six months before Morea's death, the police chief updated departmental policies and procedures for the medical screening of detainees. The written procedures provided for hourly checks of the detainees. If a detainee exhibited suicidal tendencies, special precautions were to be taken, which included checking the detainee's cell every 15 minutes.

## JURISDICTION

Ordinarily, the denial of a motion for summary judgment cannot be appealed. *Novak v. Stevens,* 596 S.W.2d 848, 849 (Tex. 1980); *City of Beverly Hills v. Guevara,* 911 S.W.2d 901, 902 (Tex.App.—Waco 1995, no writ). However, section 51.014(5) of the Civil Practice and Remedies Code provides for an interlocutory appeal of the denial of a summary judgment "that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state." TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(5) (Vernon Supp. 1996). Because the City's motion for summary judgment was in part, "based on" official immunity, we have jurisdiction. *Guevara,* 911 S.W.2d at 902.

## STANDARD OF REVIEW

The standard we follow in reviewing a summary judgment is well-established. The movant for summary judgment has the burden to show that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); TEX.R. CIV. P. 166a(c). When deciding whether there is a disputed material fact issue precluding summary judgment, we treat evidence favorable to the non-movant as true and we resolve any doubts in its favor. *Id.* at 548–49; *Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984). When a defendant moves for summary judgment based on an affirmative defense such as official immunity, it must conclusively establish each element of the defense as a matter of law. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994).

## POINTS OF ERROR

In two points of error, the City asserts that the trial court erred in denying the motion for summary judgment because its officers were carrying out discretionary duties in good faith while in the course and scope of their employment. Therefore, the City is entitled to judgment based on the officers' immunity. We reverse and render.

Official immunity is a common law defense that protects governmental officers and employees from personal liability. *See id.* Under the doctrine of official immunity, governmental employees are entitled to immunity from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *Id.* If the officers are entitled to immunity, then the governmental entity employing them also is entitled to immunity. *City of Houston v. Kilburn,* 849 S.W.2d 810, 811 (Tex.1993). Consequently, we will resolve the City's immunity by considering the officers' immunity, as the parties did in the trial court.

Ms. Burns does not dispute that the officers were acting within the scope of their authority at all times relevant to this action. Therefore, we will only address whether the officers were performing discretionary duties in good faith.

## DISCRETIONARY DUTY

A function is ministerial if the law prescribes the duties to be performed with such precision that nothing is left to the discretion of the actor. *Id.* If, however, the act involves personal deliberation, decision, and judgment, it is discretionary. *Id.; Kassen v. Hatley,* 887 S.W.2d 4, 9 (Tex.1994).

Although the City had a policy setting forth booking procedures designed to screen for potentially suicidal prisoners, the "procedure" as it was called, was not so detailed that it left nothing to the officers' discretion. The profile the policy gives for the most

likely candidates for suicide is very general. These are the characteristics the procedure listed under the heading "Recognizing a Suicidal Inmate:" white male, 22 years of age, single, usually arrested on drug related or alcohol charges, and usually charged with nonviolent crimes. The policy also noted that most suicides occur "within the first 48 hours" and a larger portion occurring with the first three hours of incarceration. Section I of the manual was styled "Symptomatology" and included the following symptoms:

1. signs of depression are important.

2. sudden mood changes may indicate suicidal thinking.

3. any reference to death must be taken seriously.

4. signs of agitation may indicate deeper emotional stress.

5. psychotic behavior.

6. history of mental illness.

7. history of suicidal thoughts or behavior.

8. recent crisis or loss.

.    .    .    .    .

10. drug or alcohol problem.

.    .    .    .    .

13. strong emotions like guilt, rage, or a desire for revenge.

14. high level of tension or anxiety.

15. many questions about death, cost of burial, estates, wills, etc.

Our review of the procedure leads us to conclude that a great deal of discretion is left with the officers to observe a detainee's behavior and assess if the person is suicidal. Officer Stanich's affidavit in support of the City's motion for summary judgment confirms this by establishing that he exercised discretion when evaluating Morea's responses to the screening questions and when evaluating Morea's behavior. In fact, discretion is very evident in a situation like the one confronting Officer Stanich who was interviewing an uncooperative person. Officer Stanich also exercised discretion by choosing which cell to put Morea in and by determining when a cell check was appropriate. Likewise, the other officers involved in booking Morea and supervising his activities while in jail were exercising discretion and not merely performing ministerial functions.

In fact, the very nature of the task the officers were performing, which is to evaluate a person's mental health, is inherently a discretionary function involving individual decision-making and judgment. Therefore, we conclude that the officers were performing discretionary functions when assessing Morea's mental health to determine if he needed special attention while in jail.

## GOOD FAITH

■ In *City of Lancaster v. Chambers*, 883 S.W.2d 650 (1994), the Texas Supreme Court articulated the test for determining if a police officer seeking official immunity acted in good faith. *Chambers* involved a police pursuit. The court held that a police officer acts in good faith if "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Chambers*, 883 S.W.2d at 656. That standard also has been applied in cases not involving police pursuits. Generally, the test for objective good faith is whether a reasonably prudent officer, under the same or similar circumstances, could have believed that his actions were justified. *See Antu v. Eddy*, 914 S.W.2d 166, 171 (Tex.App.—San Antonio 1995, no writ); *Rhodes v. Torres*, 901 S.W.2d 794, 798 (Tex. App.—Houston [14th Dist.] 1995, no writ).

■ Good faith may be established through the testimony of the officer if the testimony is clear, positive, direct, otherwise credible, free from contradiction and readily controvertible. *See Harris County v. Ochoa*, 881 S.W.2d 884, 887 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *see also Rhodes*, 901 S.W.2d at 798–800. To controvert the police officer's summary judgment proof on good faith, the nonmovant must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts." *Chambers*, 883 S.W.2d at 656.

■ In this case, the City established in its summary judgment proof that the officers

involved in the incident acted in such a manner that another reasonably prudent officer, under the same or similar circumstances, could have believed that his actions were justified. Officer Stanich's affidavit is clear, positive, direct, free from contradiction and readily controvertible. Officer Stanich stated in his affidavit, based on his personal knowledge and experience as a police officer, that once he arrived at the scene of the accident, he noticed that Morea appeared to be intoxicated. He placed him under arrest for public intoxication and failure to identify himself. Morea became very belligerent and kicked the inside of the police car. Upon arrival at the police station, Morea went to the restroom and then was taken to the booking area. Stanich asked Morea if he had any scars or tattoos and Morea responded by taking off his clothes. Officer Stanich testified that "although I considered these actions of Mr. Morea unusual, they did not surprise me." He placed Morea in a cell at appropriately 3:10 a.m. when Morea requested a cigarette, which Stanich explained he could not have.

After he returned to the booking area, Ms. Burns called and asked about her son. She did not tell him her son suffered from any mental problems or should be watched closely. According to Stanich, "at no time during the period of time I dealt with Mr. Morea did I ever consider that he was a potential suicide risk." He could hear Morea yelling but never understood what he was saying. That night the police station had other noises that made it difficult to understand Morea. As noted earlier, several large fans were running because the air conditioner was broken, and were generating a lot of noise. In addition, the trustees, who had a television set in their cell, had the volume set very high. Stanich never heard Morea say he was going to kill himself.

Officer Stanich stated that the Galveston County Police Department has written procedures for how to handle possible suicidal detainees. He stated that he did not place Morea under close supervision because he determined that Morea was not a possible suicide candidate and he followed the guidelines used for a regular detainee. "[A]ny police officer under the same facts and circumstances could have determined that there was no need to use suicide preventative procedures with Morea because he did not exhibit characteristics of suicide. Any officer could have determined on the facts of what was legal at the time that Mr. Morea was an ordinary drunk, not a potential suicide." Moreover, he stated, "[i]t is my professional opinion that Officers Don Grove, Oscar Robinson, Rose Isabel Tijerina, Angela Crummett, Carl Lyne Lomax and I were acting within the scope of our duties as police officers, that they acted in good faith, and that they exercised judgment and discretion in their decisions and their handling of the duties."

Angela Crummett, a police officer employed by the Galveston Police Department, stated in her affidavit that on June 17, 1987, while she was acting as desk sergeant, she saw Morea, who appeared to be intoxicated. However, she noticed nothing unusual or bizarre about his behavior. Because they saw nothing unusual in his behavior, she and the other officers followed the normal procedures. She said that if Morea had appeared to be suicidal the officers would have increased the level of observation and supervision over him. She exercised discretion and based her judgment on her personal experience and training in determining how to treat Morea. She never heard Morea threaten suicide.

Officers Rose Isabel Tijerina, Carl Lomax, Oscar Robinson and Don Grove all testified by affidavit that Morea showed no signs of being suicidal and they heard him make no threats to kill himself. They based their beliefs that he needed no special treatment on their personal experiences and training and stated their actions were based on what a reasonably prudent officer would have done under the same or similar circumstances in the instant case. Each of their affidavits contained numerous details about what Morea said and did at the police station and what they heard from the prisoner's cells. They could each hear Morea yelling, and sometimes they could hear him yelling for a cigarette, but none heard him say that he would kill himself if he did not get one. One or two

of the officers even said it was not uncommon for an intoxicated person to threaten to kill themselves in an attempt to manipulate the officers and disrupt the station.

We find the affidavits of Stanich, Crummett, Tijerina, Lomax, Robinson and Grove to be clear, positive, direct, otherwise credible, free from contradiction and readily controvertible. *Ochoa,* 881 S.W.2d at 887. They established that reasonable officers other than the ones involved in this case could have believed that Morea needed no special treatment and was not suicidal.

Since the City met its burden of proof, Ms. Burns had to controvert the City's proof to show that "no reasonable person in the officers' position could have thought that Morea was not suicidal or a suicide candidate and did not need special treatment." *Chambers,* 883 S.W.2d at 656. Ms. Burns' evidence does not establish that no reasonable officer could have thought Morea was not suicidal or a suicide candidate or in need of special attention. Taking the evidence in the light most favorable to Ms. Burns, at most she established that Morea threatened to kill himself and that the other prisoners heard him yell this threat; but she did not submit any proof that the officers, who were not in the cell area, heard and understood the threat. This is not enough to controvert the City's showing of good faith. *Id.*

In conclusion, we find that the officers performed discretionary acts in good faith while acting in the course and scope of their employment. We sustain points of error one and two and reverse and render summary judgment for the City that Morea's mother take nothing by her suit.